FIFTH DIVISION
March 4, 2011

No. 1-10-2563

| | | |
|---|---|---|
| *In re* | ) | Appeal from the |
| | ) | Circuit Court of |
| WILLIAM H., | ) | Cook County. |
| | ) | |
|     Minor Respondent-Appellee | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | No. 09 JA 906 |
| | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Dorothy H., | ) | The Honorable |
| | ) | Robert Balanoff, |
|     Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.

Justices Howse and Epstein concurred in the judgment and opinion.

## OPINION

Respondent-appellant Dorothy H. (respondent) appeals from orders entered by the trial court in the instant cause adjudging minor respondent-appellee William H. (William or minor) a ward of the court and holding that reasonable efforts had been made to prevent or eliminate the need for removal of the minor from the home. She contends on appeal that the trial court erred in both these findings; she asks that we reverse the court's order adjudging the minor a ward of the court and that we remand the cause for a new hearing. The State and the minor's public guardian have filed appellees' briefs. For the following reasons, we affirm.

BACKGROUND

William was born on August 7, 2002, to respondent (his biological mother) and Mr. S. (his biological father).[1]  Prior to the instant cause, respondent and Mr. S. were involved in proceedings before Judge Grace Dickler in the domestic relations division of the Cook County circuit court.  William had not lived with respondent since 2007; he resided with Mr. S. for a time, was placed with the M. family, a foster family,[2] for 20 months from October 2007 through June 2009, and was then returned to Mr. S.'s care.  However, in August 2009, when William was seven years old, Mr. S. was sentenced to four years in prison.  Illinois Department of Children and Family Services (DCFS) investigator Carolina Bono was assigned to William's case.  On August 26, 2009, based on Mr. S.'s incarceration and concern over respondent's mental health,[3] Judge Dickler ordered DCFS to take custody of William, who was then placed once again with the M. family.

In October 2009, the State filed a petition for adjudication of wardship and a motion for temporary custody, thereby initiating the instant cause.  The petition alleged that William was

---

[1]Mr. S. is not a party to this appeal.

[2]William's foster father, Mr. M., is also the biological father of William's half-sister, Valerie M.  Valerie M. resides with Mr. M., and not with respondent (her biological mother).

[3]Judge Dickler had ordered a mental health assessment of respondent during the proceedings before her.  The assessment found that respondent was not empathetic toward her children, could not be so empathetic, and may have "borderline characteristics."  It was concluded that respondent could not provide a safe environment for William.

neglected due to an injurious environment and abused due to substantial risk of injury. The petition cited respondent's history of alcohol abuse and mental illness, Mr. S.'s incarceration, and both parents' prior indicated reports where it was determined, following investigation, that there was credible evidence of abuse or neglect. Regarding these reports, the petition noted that respondent had two prior indicated reports for substantial risk of physical injury due to injurious environment and for medical neglect, while Mr. S. had four prior indicated reports for substantial risk of physical injury due to injurious environment. The petition also described that respondent had been diagnosed with bipolar disorder and mood disorder, that respondent admitted she has bipolar disorder, and that she stated she has been refusing to take her medication for over one year.

On November 3, 2009, a temporary custody hearing was held. Bono, William's DCFS investigator, testified that, as part of her investigation, she verified respondent's prior indicated reports as well as respondent's medical assessment that had been ordered by Judge Dickler. The assessment was also introduced into evidence. In the assessment, it was found, to a reasonable degree of psychiatric certainty, that: respondent has a history of depression, possibly bordering on bipolar disorder; she has a history of alcohol abuse and a pattern of unstable relationships; she does not understand William's needs; and her ability to parent and nurture William is minimal. Bono further testified that she met with respondent as part of her investigation. Respondent admitted to Bono that she had been diagnosed with bipolar disorder and she received medication for this; however, she stated that she currently did not suffer from it but only from an anxiety disorder. Respondent also told Bono that, while she had a prior alcohol addiction, she had been

sober for the last two years. Bono averred that, following her interview of respondent, she obtained records from respondent's local police department showing several police responses to her home for domestic violence between respondent and her current husband, and noting that respondent was intoxicated on seven occasions in 2009. Finally, Bono testified that, based on the information she had gathered, along with the fact that William had not been with respondent for over two years, she was concerned that William would be at risk should he be placed in respondent's care.

Respondent also testified at the temporary custody hearing. She stated that she is currently under the care of a doctor who monitors her medication management and that she sees him every two to three months. She testified that she is currently on medication for an anxiety disorder and that she is willing to do whatever she needs to regain custody of William. On cross-examination, respondent denied the existence of any domestic violence between her and her current husband. She averred that she remembered the police coming to her home four times, but that she never called them; rather, she referred to "fictitious calls," potentially from neighbors, and could not describe the instances in detail. She also attributed one of her prior indicated reports to her being late to pick William up from school, claiming that the school immediately called DCFS on her for this. Respondent admitted that William has not lived with her since 2007.

At the close of this hearing, the trial court held that probable cause existed that William was abused and neglected. Considering the facts before it, the court cited the prior indicated reports, a history of domestic violence, drug and alcohol abuse, respondent's mental health issues, respondent's lack of continuous parenting of William for the last two years, and Judge Dickler's

4

prior orders as the bases for its finding. The court issued an order giving temporary custody of William to DCFS, concluding that "immediate and urgent necessity" existed to support removal of William from the home, and that reasonable efforts could not prevent or eliminate the immediate and urgent necessity for removal. Further, the court denied visitation between William and respondent, stating that "based on the testimony and the evidence and testimony figuring out what is best for [William], I won't allow visitation" until a therapist could advise the court as to what type of visitation was in William's best interest, promising to "bring [the case] back every week" if necessary in order to "keep [the case] on a short leash and see how quickly we can get a visit." DCFS placed William with the M. family. The court then ordered a status hearing for the next week.

A series of status hearings followed from November 2009 to January 2010, regarding the issue of visitation. At these, William's caseworker, Camara Colvin, testified that she met with William, who was very nervous that she was going to take him out of his foster home. William was assigned to a therapist and began therapy at the end of November 2009. Colvin related that William had become very stressed after receiving a letter from respondent in the mail, crying and expressing fear that he would be removed from his foster home. Colvin further stated that William's therapist told her she needed more time to complete her assessment regarding the appropriateness of visitation between William and respondent. Regarding the status of the cause itself, Colvin averred that an integrated assessment had not yet been completed and that she could not prepare a service plan for respondent until this assessment was finished.

An adjudication hearing was held on March 3, 2010. At this hearing, respondent agreed

to a written stipulation of facts. These included respondent's two prior indicated reports for substantial risk of injury due to injurious environment and medical neglect; the fact that she has another child not in her care or custody (*i.e.*, Valerie M.); that she has not had custody of William since March 2007; that she has a history of alcohol abuse, domestic violence, mental illness and psychiatric hospitalizations; that she has been diagnosed with bipolar disorder and mood disorder; and that she has not been taking any medication for these psychiatric disorders. Apart from again conceding the facts to which she stipulated and asking the trial court to find that she was noncustodial at the time William was taken by DCFS, respondent made no other argument at this hearing. Based upon the evidence, the court found that William was neglected due to an injurious environment and abused due to a substantial risk of physical injury. The court sought to continue on to the dispositional hearing at this point. However, the parties informed the court that the required integrated assessment had not yet been completed, nor had William's therapists issued the requested report regarding the appropriateness of visitation between William and respondent. The court set the case for further status.

At a status hearing in March 2010, Laurie Leslie, William's new caseworker, testified that the process for completing the integrated assessment had begun and that she would prepare the service plan for respondent once that was completed. A letter from the head of the clinical therapy program in which William was enrolled and William's two therapists was then presented to the court. The letter described the services they had been providing to William and diagnosed him with adjustment disorder with mixed anxiety and depressed mood. It also detailed William's therapy sessions in which William consistently expressed his desire not to visit respondent, his

expressions of fear at the prospect of being returned to respondent's care, and his repeated refusal to even talk about respondent during therapy. The letter further stated that William "has not been very cooperative with therapy, and he usually does not want to talk." The therapists concluded that, because of this, they were not qualified to make any assessment regarding the appropriateness of visitation between William and respondent, as the court had requested.

Further status hearings were conducted in May and June 2010. Caseworker Leslie completed the integrated assessment and provided a copy of it to the parties. William continued to participate in therapy, but "shut down" whenever he was asked to discuss respondent or visitation with her.

In July 2010, respondent filed a motion requesting a finding that no reasonable efforts had been made to reunify her and William from August 2009 (when temporary custody was first given to DCFS by Judge Dickler) to the current time.

On July 29, 2010, the trial court conducted a dispositional hearing in William's cause and heard argument on respondent's motion. Caseworker Leslie testified on behalf of the State. She discussed that, while William's case began in November 2009, she was not assigned to it until February 2010 and the integrated assessment was not completed until June 2010. Regarding this assessment, Leslie noted that the following services were recommended for respondent: individual counseling, parenting classes, a parenting capacity assessment, a substance abuse assessment, domestic violence services and a psychological examination. Leslie had referred respondent for these services in June 2010, but as of the instant hearing, respondent had not participated in any of them. Leslie also described that further information on respondent was required, including

records from the doctor she stated she sees for her medication management, her past psychiatric diagnosis and a current substance abuse assessment.

Regarding William, Leslie testified that he is still living with the M. family, where he has resided continuously since August 2009. Leslie visited this foster home and found that it was safe and appropriate. Leslie also testified regarding William's therapists. She described that William's initial therapist had closed his case in June 2010, believing that therapy was harming him, noting that he was not making progress and would not talk about respondent, and concluding that, therefore, she could not give a viable opinion as to whether visitation with respondent was appropriate. Leslie averred that she would identify a new therapist for William. However, Leslie described that the completed integrated assessment did address this issue and, along with recommendations from her agency, concluded that visitation between William and respondent was not appropriate. Leslie stated that she believed it was in William's best interest to be made a ward of the court.

In addition to Leslie's testimony, several documents were admitted into evidence, including the integrated assessment and two letters from Maria Potter, a licensed clinical supervisor involved in William's case. The integrated assessment noted that information obtained from interviews with respondent was contradicted by information from other sources, including police files, DCFS records and information gathered in interviews with William. It detailed incidents which prompted respondent's prior indicated reports, school interventions, respondent's psychiatric behavior and her discontinuation of her psychotropic medication.[4] The assessment

---

[4]The integrated assessment also detailed incidents involving William's father, Mr. S.

8

also included interviews with respondent and William from March and April 2010. In her interview, respondent could not identify any weakness or areas requiring improvement in her parenting skills, and described her current relationship with William as "very close and very tight" and as "the greatest." Meanwhile, in his interview, William demonstrated a clear fear of respondent, rating it as a 10 on a scale of 1 to 10, and he described that she hit him with a belt and did not feed him. William repeatedly stated to Leslie that he did not want to have any contact with respondent, cried, and appeared anxious when questioned about her. William expressed his desire to continue living in his foster home, stated that he felt safe there, and referred to his foster parents as "mom" and "dad." William had also just successfully completed the second grade. Based on all this, the integrated assessment concluded that the prospect for reunification was poor, that respondent needed to address several issues before reunification could be considered, and that visitation between respondent and William should take place only if and when William agreed to it. Clinical supervisor Potter's letters, prepared in July 2010, reviewed William's situation and recommended that visitation between William and respondent was not appropriate.

Following the evidence, the trial court heard argument from the parties. The State and the public guardian agreed that it was in William's best interest to be made a ward of the court, that respondent be found unable to care for him, and that respondent's motion for a finding of no reasonable efforts be denied. Respondent, meanwhile, argued solely that she could only be found unable and that the court should grant her motion for a finding of no reasonable efforts.

---

Briefly, in addition to his being sentenced to jail, these included alcohol abuse, domestic violence between him and multiple girlfriends, and the confiscation of loaded weapons kept in his home.

9

Respondent did not present an argument regarding wardship.

At the close of the dispositional hearing, the trial court adjudged William a ward of the court. At the outset of its colloquy, the court noted:

"[T]here is no argument that the minor shouldn't be made a ward of the Court, so the minor will be made a ward of the Court. The parties seem to agree that the mother *** [is] unable only, and that will be the finding."

It then turned to an examination regarding respondent's claim of no reasonable efforts. The court was critical of the cause's timeline, noting that the completion of the integrated assessment–which was required to move toward reunification–was "very delayed." It also acknowledged that it was "upset" by the fact that respondent had not yet been referred for and begun the services required. However, the court stated that, nonetheless, "the most important thing" for reuniting respondent and William "is that William has to be willing to visit" with respondent and "not be fearful of" her, which was not the case. Thus, the court issued "a finding of reasonable efforts because the most reasonable effort to reunite this family would be to get therapy for William, and he has been in therapy," and that this "most important effort" has "been unsuccessful, obviously." It reiterated that "there is no hope for reunification at all [in William's case] unless he is in a position to say, yes, I'm at least willing to meet with [respondent]. *** [T]hat was the most important effort that could have been made ***," and, although it failed, it was clear that reasonable efforts had been made. Therefore, the court denied respondent's motion for a finding of no reasonable efforts.[5]

_____

[5]During the progression of this cause, respondent filed a second motion, seeking to compel DCFS to obtain a therapist's advice regarding what type of visitation was in William's

No. 1-10-2563

Accordingly, in its written order, the trial court declared William a ward of the court, found respondent unable to care for him, and noted that reasonable efforts had been made to prevent or eliminate the need for removal, that appropriate services for reunification have been unsuccessful, and that it is in William's best interest to be removed from respondent's custody and placed in the guardianship of DCFS.

ANALYSIS

Respondent presents two contentions for our review. Her first involves the trial court's denial of her motion for a finding of no reasonable efforts. That is, respondent contends that the court erred in finding that reasonable efforts had been made to prevent or eliminate the need for William's removal. She asserts that, because no effort was made to obtain a therapist's assessment of William's situation, the court had no factual basis upon which to conclude that reasonable efforts for reunification had been attempted or that these efforts proved unsuccessful. We disagree.

As a threshold matter, we note, as the public guardian does in its brief, that respondent on appeal uses interchangeably the phrases "reasonable efforts to prevent or eliminate the need to remove" William from her care and "reasonable efforts to reunify" William and respondent. As these phrases are not entirely interchangeable concepts, we wish to provide some clarification. In

best interest, as per the trial court's initial November 2009 order. After denying her motion for a finding of no reasonable efforts, the court granted respondent's second motion, ordering a therapist's evaluation, along with the receipt of certain records, the solidification of referrals, the placement of services, and weekly monitoring of this cause.

11

its oral colloquy following the dispositional hearing, the trial court held that DCFS had made reasonable efforts at reunification, but that these were unsuccessful. Indeed, in respondent's own motion, she specifically sought a declaration that reasonable efforts to reunify William and herself had not occurred. However, in its written order, the court checked a box on a preprinted order form stating that reasonable efforts had been made to prevent or eliminate the need for William's removal from respondent's home, rather than the box directly below it stating that reasonable efforts had made for reunification. As the public guardian points out, a court's oral pronouncement of its decision prevails over its written order, should a conflict arise. See *In re R.W.*, 371 Ill. App. 3d 1171, 1173 (2007); accord *In re Taylor B.*, 359 Ill. App. 3d 647, 651 (2005). Accordingly, we note for the record and for purposes of clarity that we are dealing here with reasonable efforts toward reunification.

The parties agree that the standard of review pertinent to this issue is manifest weight of the evidence. We, too, find this to be correct. As the record demonstrates, the court's reasonable-efforts finding was entered at the end of the dispositional hearing in William's cause. Thus, it was part of the court's dispositional ruling, which also held that William should be made a ward of the court. A trial court's dispositional decision regarding a minor rests within the that court's discretion and will not be overturned unless it is against the manifest weight of the evidence or the court abused its discretion by selecting an inappropriate disposition. See *In re J.C.*, 396 Ill. App. 3d 1050, 1060 (2009); see also *In re Ta.A.*, 384 Ill. App. 3d 303, 307 (2008); *In re T.M.*, 125 Ill. App. 3d 859, 861 (1984). We further acknowledge that a trial court's decision is against the manifest weight of the evidence only when the opposite conclusion is

12

clearly apparent (see *In re Faith B.*, 359 Ill. App. 3d 571, 573 (2005)), and that it abuses it discretion only when it acts arbitrarily without conscientious judgment (see *Connor v. Velinda C.*, 356 Ill. App. 3d 315, 324 (2005)). Ultimately, there is a "strong and compelling presumption in favor of the result reached by the trial court" in child custody cases. *Connor*, 356 Ill. App. 3d at 323.

Based upon our thorough review of the record in the instant cause, we cannot find that the trial court's decision to deny respondent's motion for a finding of no reasonable efforts was against the manifest weight of the evidence or demonstrated an arbitrary or unconscientious judgment. Rather, we find that the trial court properly denied her motion, as reasonable efforts at reunification were clearly undertaken in this cause.

Respondent is correct in her characterization of a considerable delay at reunification efforts with William. As the record shows, the temporary custody hearing occurred in November 2009, but the integrated assessment (which was required to move this case along) was not completed until June 2010 and, as of the July 2010 dispositional hearing, the agencies involved herein had still not obtained all the records they wanted nor had referred respondent for services so she could begin them. The record also notes that caseworkers and therapists came and went, and that the participating agencies, at times, seemingly did not timely address William's case due to some anomalies with it. Indeed, the trial court, in its colloquy at the end of the dispositional hearing, made clear its concern at the delay in William's case and informed everyone involved that it found this to be "upset[ting]."

However, respondent's insistence that because of this the court had no factual basis for

13

denying her motion cannot stand.

Throughout the proceedings in William's cause, the court was inundated with factual evidence that William did not want to have any contact with respondent. As early as the November 2009 temporary custody hearing, the court prohibited visitation between respondent and William until a therapist could evaluate what type of visitation would be appropriate and would not traumatize William any further. Subsequently, caseworker Colvin had meetings with William. She testified that he was always very nervous that she would take him out of his foster home and place him with respondent. Colvin describe one incident when William went to check the mailbox and found a letter addressed to him from respondent. This stressed William, resulting in his crying and his further fear that he would be returned to respondent. Similarly, caseworker Leslie, who took over William's case, testified that William repeatedly "shut down" whenever he was asked about respondent or the potential for visitation with her. In her interviews with William, he consistently told Leslie that he wanted to stay in his foster home with the M. family and his half-sister, felt safe there, and called his foster parents "mom" and "dad." He clearly stated that he did not want to have any contact with respondent, including visitation.

In addition to these caseworkers' testimony, the court was presented with several documents regarding the propriety of visitation between respondent and William. These included the integrated assessment, which contained William's interviews, agency letters recommending that visits were inappropriate, and letters from William's therapists. In the last of these, William's therapists detailed his continuous expression of no desire to visit respondent, his fear at the potential of this, and his complete refusal to even talk about respondent during their sessions. In

fact, the therapists stated that, because of this, they could not even form an opinion on the propriety of visitation and had to close his case because no progress was being made; the therapists stated that trying to address the visitation issue with William was actually doing more harm than good.

It was precisely upon all these facts that the trial court here based its ruling regarding reasonable efforts. As the court explained, the major obstacle to reunification in William's case was that William did not want to have any contact with respondent. The court stated that "the most important thing" for reuniting respondent and William was that William had to be at least willing to visit with her and not be fearful of her. To accomplish this, the court had ordered therapy for William. According to the court, this therapy was "the most reasonable effort to reunite this family." And, as proven by the record, DCFS implemented, and William participated in, this therapy. However, by the July 2010 dispositional hearing, it was clear that the therapy–the "most important effort that could have been made" toward reunification–was simply unsuccessful. Yet, that "the most reasonable effort" applicable to William's cause failed does not negate the fact that, as the trial court found, reasonable efforts had, indeed, been made.

We note that, at the very end of her brief, respondent makes one, and only one, reference to any supportive legal precedent: a cursory citation to *In re C.S.*, 376 Ill. App. 3d 114 (2007), which she states is similar to the instant cause and should control here. This is wholly incorrect. In *C.S.*, the State filed a petition for adjudication of wardship of the minor based on the respondent-mother's mental disabilities. During the proceedings, the respondent filed a motion asking the trial court to conduct a mental examination of her in an effort to obtain for the record a

15

complete diagnosis of her alleged disabilities. The court denied her motion, along with a subsequent oral motion for the same. Eventually, the court issued an order adjudging the minor a ward of the court, having found that the State proved the allegations in the petition for adjudication. See *C.S.*, 376 Ill. App. 3d 116-17. The respondent appealed, contending that the trial court erred in denying her motions for mental examination, as such an examination was necessary to determine the validity of the State's petition. The *C.S.* court agreed, reversing and remanding the cause. See *C.S.*, 376 Ill. App. 3d at 119. In rendering its decision, the *C.S.* court acknowledged that the sole basis for the State's petition for adjudication was that the respondent was mentally disabled, which she denied. See *C.S.*, 376 Ill. App. 3d at 118. Because there was no current and complete mental examination of record, there simply was no factual basis for the trial court's holding and it was, therefore, improper. See *C.S.*, 376 Ill. App. 3d at 119.

*C.S.* is wholly distinguishable from the instant cause. First, *C.S.* does not even address the question of reasonable efforts at reunification, which comprises the crux of respondent's argument here. Moreover, while the trial court's denials of the respondent's motions in *C.S.* were clearly improper, the trial court's denial of respondent's motion here was, in contrast, entirely appropriate. In the instant cause, unlike *C.S.*, the court did not render a decision without a factual basis. Rather, as we have already discussed, there was more than ample evidence, including factual testimony and documentation, presented to the trial court herein detailing that, contrary to respondent's allegations in her motion, reasonable efforts at reunification had been undertaken.

Therefore, based on our review of the record, we find that the trial court did not err in denying respondent's motion for a finding of no reasonable efforts and, in turn, holding that

16

reasonable efforts had been made regarding William's cause.

We now turn to respondent's second, and final, contention for review, which she inextricably links to her first. This time, challenging the trial court's wardship determination, she asserts that, because there was no factual basis for the reasonable-efforts finding, the court's wardship order must also be reversed. Again, we disagree.

Multiple threshold matters defeat a review of respondent's contention at the outset. First, issues regarding whether a minor should be adjudged a ward of the court are not related to issues regarding reasonable efforts on the part of DCFS toward reunification. These concepts are on two wholly different planes and, significantly, respondent provides us with no case law or statute to the contrary. The Juvenile Court Act of 1987 (Act) provides that, once a trial court determines a minor has been abused or neglected, it must conduct a dispositional hearing to decide "whether it is consistent with the health, safety and best interest of the minor and the public that he be made a ward of the court." 705 ILCS 405/2-21(2) (West 2008). It is this "best interest" analysis (which we will discuss in more detail below) that is key to a wardship decision, not a finding regarding whether reasonable efforts toward reunification were employed by an agency involved in the cause. See *In re Violetta B.*, 210 Ill. App. 3d 521, 533 (1991) (the "paramount consideration in all guardianship and child custody cases is the best interests of the child"); accord *In re Austin W.*, 214 Ill. 2d 31, 49 (2005); *In re S.J.*, 364 Ill. App. 3d 432, 442 (2006) (a child's best interest takes precedence over any other consideration). Second, even if respondent were correct in her assertion that a lack of reasonable efforts requires the reversal of a wardship determination, we have already held that abundant factual evidence existed to support the trial

17

court's decision that reasonable efforts had been employed in William's cause. Therefore, even in that instance, respondent's argument could not stand.

Third, and most critically, respondent has waived any consideration of the propriety of the trial court's wardship determination for our review. It is well established that, to preserve an alleged error for appellate review, a party must, even in child custody cases, object at trial and file a written posttrial motion addressing it. See *In re Lakita B.*, 297 Ill. App. 3d 985, 991 (1998); *In re Christopher J.*, 338 Ill. App. 3d 1057, 1058 (2003); see also *In re April C.*, 326 Ill. App. 3d 225, 242 (2001) ("[w]here a party fails to make an appropriate objection in the court below, he or she has failed to preserve the question for review and the issue is waived"). In addition, "[a] party is estopped from taking a position on appeal that is inconsistent with a position the party took in the trial court." *In re Stephen K.*, 373 Ill. App. 3d 7, 25 (2007).

Respondent here never objected at trial to the court's wardship determination. Rather, the record reveals that, at the close of William's dispositional hearing, the trial court heard argument from the parties. The State and the public guardian urged that it was in William's best interest to be made a ward of the court. Respondent, meanwhile, never addressed this point. Instead, the only argument she presented was that the court should, based on the evidence, enter a finding of "unable" (*i.e.*, that she was currently unable to care for William). The record is unmistakably clear that respondent did not present an argument regarding wardship. The trial court, too, noted this at the start of it colloquy rendering its dispositional decision in the matter:

> "[T]here is no argument that the minor shouldn't be made a ward of the Court, so the minor will be made a ward of the Court. The parties seem to agree that the

18

mother *** [is] unable only, and that will be the finding."

Again, respondent did not refute this point. Accordingly, her attempt to now raise a challenge to the trial court's wardship finding on appeal is forfeited. See *April C.*, 326 Ill. App. 3d at 241-42 (where the respondent did not object to stipulation during dispositional hearing, issue was forfeited); see, *e.g.*, *Stephen K.*, 373 Ill. App. 3d at 25 (a party cannot challenge a trial court's wardship finding once she has conceded that the child should be made a ward of the court).

Even were we to place waiver aside and address respondent's assertion, we would conclude, based on the record before us, that the trial court's determination of wardship in the instant cause was proper.

As we noted above, in all guardianship cases, " 'the issue that singly must be decided is the best interest of the child.' " *Austin W.*, 214 Ill. 2d at 49 (quoting *In re Ashley K.*, 212 Ill. App. 3d 849, 879 (1991) (this "is not part of an equation" but, rather, the main factor that "must remain inviolate and impregnable from all other factors")); see also *Violetta B.*, 210 Ill. App. 3d at 533. A child's best interest takes precedence over any other consideration, including the natural parents' right to custody. See *S.J.*, 364 Ill. App. 3d at 442 (the superior right of a parent to custody of his minor child is not absolute and must always yield to the minor's best interest); *In re J.L.*, 308 Ill. App. 3d 859, 864-65 (1999). Accordingly, it is not even necessary for a court to first find the minor's parents unfit or that they forfeited their custodial rights if a best interest determination shows that the minor should be placed with someone other than his parents. See *S.J.*, 364 Ill. App. 3d at 442; accord *In re M.M.*, 337 Ill. App. 3d 764, 779 (2003); *Violetta B.*, 210 Ill. App. 3d at 533.

In assessing a minor's best interest, the trial court is to look to all matters bearing on his welfare. See *Violetta B.*, 210 Ill. App. 3d at 534. These include several factors delineated in the Act itself which take into consideration the minor's age and developmental needs, including:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued ***;

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

20

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child."  705 ILCS 405/1-3(4.05) (West 2008).

See also *Austin W.*, 214 Ill. 2d at 49-50; *In re Desiree O.*, 381 Ill. App. 3d 854, 865-66 (2008). Additionally, a court may consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his emotional and psychological well-being.  See *Austin W.*, 214 Ill. 2d at 50; *Desiree O.*, 381 Ill. App. 3d at 865-66; accord *J.L.*, 308 Ill. App. 3d at 865.  On review, we will not disturb the trial court's decision on wardship unless it is against the manifest weight of the evidence.  See *In re Gwynne P.*, 346 Ill. App. 3d 584, 599 (2004).

Pursuant to our thorough examination of the record in the instant cause, we cannot conclude that the trial court's decision here adjudging William a ward of the court is against the manifest weight of the evidence.  To the contrary, we agree with the trial court that the evidence overwhelmingly shows that such a disposition was in William's best interest.  William consistently and continually expressed to multiple caseworkers and therapists throughout the progression of his cause that he is fearful of respondent and does not want to have any contact with her.  In his interviews, he cited instances of respondent's physical abuse toward him and her refusal to feed him.  Also undeniable in this cause is the role of domestic violence and substance abuse in the home William shared with respondent and his biological father, as well as domestic violence and substance abuse in the home of respondent and her current husband.  And, those in charge of William's case have repeatedly noted William's anxiety and nervousness whenever the

21

conversation turned toward any mention of visitation with respondent. In one instance, William began crying and expressed fear when he received a letter from respondent in the mail. Significantly, William's therapists have diagnosed him with adjustment disorder with mixed anxiety and depressed mood. His therapists have also described that a great source of his disorder is the fact that William has been constantly moved--from respondent, to the M. family, to his biological father, and again to the M. family. William will not talk about respondent and "shuts down" at therapy sessions when simply asked about her.

In contradistinction, William has been doing well in his foster home. The record demonstrates that he lived with the M. family before, during the two-year period between 2007 and 2009 when he was not in respondent's care. In addition, while living with the M. family, William is also living with his biological half-sister, Valerie M., who (similarly) is not in respondent's custody. William has expressed that he feels safe in his foster home, and he has told all those involved in his case that he wants to continue living with the M. family. Moreover, he calls Mr. and Mrs. M. "mom" and "dad," and while in their care, he has been doing well in school, timely completing the second grade.

Respondent has had two prior indicated reports for substantial risk of physical injury due to injurious environment and for medical neglect of William. She has also been diagnosed with bipolar disorder, which she initially admitted she has but then stated she only has an anxiety disorder; she has refused to take any medication for over a year. In her personal interviews regarding William, she denies any sort of abuse or neglect and instead insists that her relationship with him is close (even though he has not lived with her for several years) and everything is

otherwise great; nor does she believe she has any weakness in her parenting skills. Moreover, she continues to state that she has been clean and sober and to deny that she was/is involved in a domestic violence situation, even though multiple police reports have been produced directly refuting her statements. Ultimately, no one involved in this cause has ever suggested that visitation between respondent and William is appropriate--particularly when, at the time of the trial court's dispositional order, respondent had not yet completed any of the recommended services.

The Act promotes that, whenever possible, the minor's family ties should be preserved. See 705 ILCS 405/1-2(1) (West 2008). However, as we have discussed, the Act also mandates other considerations, specifically, the best interest and welfare of minors, and it is these latter principles which dominate. See 705 ILCS 405/1-2(1) (West 2008); *Austin W.*, 214 Ill. 2d at 46; see also *Faith B.*, 359 Ill. App. 3d at 572. In the instant cause, the trial court repeatedly discussed a progression toward potential reunification; it consistently held status hearings and told the parties that it wanted to keep the cause "on a short leash" so visitation could be reestablished quickly. However, it also made clear that its desire for this, as well as its dismay with the delays involved, did not outweigh William's best interest, which was to be adjudged a ward of the court. Also, we note that neither the court's decision in this regard nor any other proceeding herein prevents respondent from pursuing reunification and a change of wardship in the future. In the end, it is clear that the court made its determination based on William's best interest, as it was required to do. Thus, there is no basis for respondent's assertion that wardship was improperly decided.

From all this, we find ample evidence in the record to support the trial court's finding that adjudging William a ward of the court was in his best interest. Therefore, we cannot say that this decision was against the manifest weight of the evidence.

CONCLUSION

Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court.

Affirm.