2023 IL App (4th) 230496-U

NOS. 4-23-0496, 4-23-0497, 4-23-0498, 4-23-0499, 4-23-0500 cons.

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 24, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Ka. F., Ki. F., E.F., I.F., and A.F., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Livingston County |
|    Petitioner-Appellee, | ) | Nos. 21JA33 |
|      v. | ) |   21JA34 |
| Christopher F., | ) |   21JA35 |
|    Respondent-Appellant). | ) |   21JA36 |
| | ) |   21JA37 |
| | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Cavanagh and Zenoff concurred in the judgment.

**ORDER**

¶ 1  *Held*: The appellate court affirmed the judgment of the trial court terminating
    respondent's parental rights where the court's fitness and best interest findings
    were not against the manifest weight of the evidence.

¶ 2    In September 2021, the State filed a motion to terminate the parental rights of

respondent, Christopher F., as to his minor children, Ka. F. (born in 2010), Ki. F. (born in 2013),

E.F. (born in 2015), I.F. (born in 2016), and A.F. (born in 2017). The children's mother, Paige

M., is not a party to this appeal. A half-sibling, T.K., is also not a subject of this appeal. In May

2023, the trial court granted the State's petition and terminated respondent's parental rights.

¶ 3    Respondent appeals, asserting the trial court erred in determining (1) he was unfit

and (2) it was in the children's best interest to terminate his parental rights. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5            In October 2020, the State filed a petition for adjudication of wardship in each

case, alleging respondent's five children were neglected under section 2-3(1)(b) of the Juvenile

Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)) in that the

children's environment was injurious to their welfare. The State alleged respondent was

previously indicated by the Illinois Department of Children and Family Services (DCFS) in 2014

and 2017 due in part to respondent's substance abuse, unaddressed domestic violence issues, and

a lack of remedial care in that the minors' home was infested with cockroaches and mice and had

rotting garbage and feces strewn throughout. Respondent was found unfit in one of the cases and

has not since been found fit. The State further alleged respondent had a lengthy criminal history,

allowed a person previously indicated by DCFS to act as a caregiver for the minors, and

demonstrated erratic and chaotic behavior toward a DCFS investigator. The trial court placed

temporary custody and guardianship of the children with DCFS. After several continuances, the

matter was set for a dispositional hearing in May 2021.

¶ 6            In March 2021, Children's Home Association of Illinois (CHAIL), which the

record indicates was an agency designated by DCFS to provide case management, filed a

dispositional hearing report. The report noted respondent was currently incarcerated on a parole

violation. The record indicates the parole violation was related to respondent violating a

no-contact order with Paige. Respondent and Paige had been residing in the same home, and

they denied knowledge of any contact restrictions as a condition of respondent's parole.

¶ 7            Also in March 2021, DCFS filed an integrated assessment report. The report

noted various injuries to three of the children in 2020, and respondent had been in the home

despite orders from his parole officer he was to have no contact with Paige because of their

- 2 -

history of domestic violence. Following an interview, DCFS set goals for respondent to (1) obtain a substance abuse evaluation and follow all treatment recommendations, (2) complete a parenting program, (3) complete a domestic violence program, and (4) develop a comprehensive system of social and emotional support for himself. The report found the prognosis for reunification between respondent and his children was poor.

¶ 8        On May 7, 2021, the trial court held a dispositional hearing. The State dismissed allegations alleging respondent and Paige lived together and respondent lied to DCFS about a no-contact order. Respondent and Paige then stipulated to the remaining allegations. The court found respondent unfit, adjudicated the children neglected, and placed guardianship with DCFS. The court ordered respondent to perform the following tasks in order to correct the conditions that led to the removal of the children: (1) execute all authorizations required by DCFS to evaluate him and the children, (2) fully cooperate with DCFS, (3) complete a substance abuse assessment and all recommended treatment, (4) perform two random drug screens per month, (5) participate in counseling and complete the recommended treatment, (6) complete parenting and domestic violence programs, (7) obtain and maintain stable housing suitable for the children, and notify DCFS of any changes in household membership, (8) provide DCFS with identifying information related to individuals in respondent's life who could impact the children, (9) attend all scheduled visits with the children, (10) use best efforts to obtain or maintain a legal source of income, and (11) have no contact with Paige. On March 29, 2022, the court entered a permanency order finding respondent unfit because he had not made reasonable or substantial progress toward the return-home goal.

¶ 9        On April 11, 2022, the State filed petitions for termination of parental rights, alleging respondent was unfit under (1) section 1(D)(b) of the Adoption Act (750 ILCS

50/1(D)(b) (West 2022)) because he failed to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare; (2) section 1(d)(i) of the Adoption Act (750 ILCS 50/1(d)(i) (West 2022)) because he was depraved; and (3) sections 1(D)(m)(i), (ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2022)) for (a) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the children during a nine-month period after the adjudication of neglect and (b) failure to make reasonable progress toward the return of the children to his care during a nine-month period after the adjudication of neglect. The State alleged two nine-month periods: May 7, 2021, to February 7, 2022, and June 29, 2021, to March 29, 2022. In July 2021, the cases were transferred from Peoria County to Livingston County.

¶ 10         In September and November 2022 and February and March 2023, the trial court held a hearing on the petition. Shari Cooper, a caseworker at CHAIL, testified she was the children's caseworker from March 2021 to December 2021. Cooper reported respondent had been incarcerated for a parole violation when she began work on the case and was released a couple of weeks later. That incarceration affected respondent's ability to complete services or attend visitation with the children. Cooper believed there was some trauma felt by the children because of respondent's incarceration.

¶ 11         After respondent's release, he completed a substance abuse assessment and had good attendance at recommended treatment sessions. He generally completed his drug screens. When he missed one, he called immediately and told Cooper why he missed it. Cooper lacked records showing whether respondent tested positive for drugs from any of the tests. Respondent also attended individual counseling. Cooper testified respondent was cooperative, and he attended domestic violence and parenting classes. However, he had not progressed to being able

- 4 -

to have unsupervised visits or overnight visits with his children. Respondent also was not to have contact with Paige but contacted her the night he was released from incarceration. Cooper also testified she found respondent had contact with Paige on social media, and Cooper "immediately stopped that." Respondent told Cooper he had no restrictions with regard to Paige, which was untrue.

¶ 12        Cooper testified respondent was required to maintain stable housing, but she was unable to visit his home. Respondent had moved into his girlfriend's home, and respondent told her his girlfriend did not want her to come to the house. Thus, Cooper was unable to perform a safety check of the home.

¶ 13        Matthew Sanders, a caseworker at the Center for Youth and Family Solutions (CYFS), which the record indicates was also designated by DCFS to provide case management, testified he worked on the matter as a caseworker from October 2021 until January 2022. While Sanders was the caseworker, respondent was cooperative, generally took part in services, and did not miss visits with the children. However, he failed to participate in six drug screens, resulting in those screens being presumed positive. He also had three positive tests for tetrahydrocannabinol (THC), which was legal in Illinois. Sanders rated respondent unsatisfactory in keeping appointments because he was not good about scheduling family meetings. In November 2021, respondent was again incarcerated for a parole violation and unable to complete services. Sanders testified respondent's reincarceration negatively affected the children and described the various serious emotional effects it had on them. Respondent never progressed to unsupervised visits with the children.

¶ 14        Natasha Bever testified she worked as the children's caseworker at CYFS from January 2022 until April 2022. Bever testified respondent was released from incarceration in

February 2022 and engaged in mental health services and drug screens. He tested positive for THC in one of the screens. Bever stated respondent was cooperative, and he restarted visitation with the children.

¶ 15        Karoline Hull, a regional coordinator and caseworker at CYFS, testified she was the caseworker on the matter from April 2022 to the present date. Hull testified respondent was cooperative, participated in services, and completed required courses, but she described his participation in drug screens as inconsistent. He also maintained employment and housing. Hull testified respondent had to rebuild relationships with his children after each time he was incarcerated. She believed the children did not view him as a father figure. Respondent had not progressed to unsupervised or overnight visits. Although respondent had made substantial progress, Hull had concerns about his ability to provide stability for the children, all of whom had specific mental health and educational needs.

¶ 16        Respondent testified he visited the children twice per month and never missed a visit when he was not incarcerated. He said he provided food, toys, and clothing for the children. Respondent was living with his girlfriend, and visits were occurring at his home, which had been cleared as a safe place. Respondent attended the children's school meetings, extracurricular activities, and medical appointments when it did not conflict with his work schedule. Respondent was employed as a roofing foreman. Respondent testified he was incarcerated in December 2021 for a parole violation because he moved into his mother's residence but failed to properly update his address. He admitted he was incarcerated in the past for escape, criminal damage to state property, theft of state property, obstruction and resisting a peace officer, aggravated battery, and aggravated domestic battery. The record includes exhibits showing respondent was previously convicted of nine felonies, with the most recent in 2018. Respondent

completed a parenting program in prison, completed a domestic violence program, and was in therapy. He stated he completed a substance abuse assessment, and treatment was not recommended. He admitted testing positive for THC. He also admitted his last drug screen was in November 2022. Respondent testified he was taking accountability for his actions. On cross-examination, he admitted he previously violated his parole by contacting Paige.

¶ 17   The trial court found the State proved respondent was unfit by clear and convincing evidence. In particular, the court noted respondent spent significant periods of time in prison while the children were young. The court expressed concern respondent, upon being released from prison in August 2020 and being reintroduced to the children, violated his parole by having contact with Paige and was again incarcerated from November 2020 to April 2021. The court observed he made good progress when released but was yet again incarcerated from December 2021 to February 2022 for another parole violation. The court found the periods of incarceration had serious, negative impacts on the children. Thus, the court found respondent was depraved under the Juvenile Court Act. Likewise, the court also found respondent failed to make reasonable efforts or reasonable progress toward the children's return during the nine-month periods at issue. The court recognized the progress respondent had made but stated he ultimately "ended both periods of time in the same place he started, incarcerated." The court then moved on to the best interest portion of the hearing.

¶ 18   Hull testified about the children's foster placements. She also provided a report addressing the specific statutory factors applicable to the best interest determination. Hull stated each child's foster home was the only home where they felt secure, loved, valued, nurtured, and safe.

¶ 19        Ki. F., E.F, and I.F. were placed together with their paternal grandfather and his wife. The record shows Ki. F. had an Individualized Educational Program (IEP) for speech, reading, and emotional disturbance. E.F. had a history of difficulty with anger management, emotional dysregulation, and hyperarousal. I.F. had a history of physical violence toward his siblings and grandparents and had an IEP for reading. Hull testified the children showed a sense of love and affection for their grandparents and had a sense of security in their home. Their grandparents provided for their needs and wished to adopt them. Because of their young ages, Ki. F., E.F, and I.F. were not able to express whether they wished to stay in the foster home.

¶ 20        Ka. F. was placed with her paternal grandmother and lived with her grandmother and her husband. The record shows Ka. F. had previously been placed with her paternal grandfather but was removed after numerous instances of physical aggression toward her siblings. She had an IEP, was often angry, and had trouble sleeping. Hull testified Ka. F. had serious mental health issues and, at the time of the hearing, had been transported to a behavioral health psychiatric unit after engaging in a physical altercation at school and having suicidal thoughts. Her grandparents were the people who got her help for those issues. Ka. F. was comfortable with her grandmother and her husband and showed love and affection toward them. Ka. F. expressed fear of losing her placement with her grandmother and wanted to stay with her grandmother and her husband.

¶ 21        A.F. was placed with fictive kin, who was the father of the child of respondent's sister. The record shows A.F. had been hospitalized for aggression and had a diagnosis of occupational defiance disorder. Hull testified A.F. was very trusting of her foster parent and had a parental bond with him. The foster parent met her needs and was able to deal with her

behavioral issues. He was also open to adopting A.F. A.F. was too young to express her wishes about adoption.

¶ 22        The children's guardian *ad litem* (GAL) provided a report applying the statutory factors applicable to determining the best interest of the children. The GAL noted instances in which the children stated they wanted to be together, would like to try living with respondent, feared not seeing their parents, or wanted "greater sovereignty" or "autonomy" in determining when to see their parents. Ka. F. also expressed concern about losing contact with her half-sibling, T.K. However, the GAL noted those reasons alone did not provide a basis for not terminating parental rights, as the trial court had to weigh the immediate and long-term best interest of the children. The GAL also noted respondent's immediate and extended family were the caregivers of the children, making it likely he would be able to continue providing the children with attention and affection. The GAL wrote the caregivers were "very vocal about maintaining a family bond" and displayed "a natural affinity toward their kin." Ultimately, the GAL recommended the court change the permanency goals of the children to adoption.

¶ 23        A parenting capacity assessment noted respondent was generally able to meet the children's caregiving needs but expressed concern he was unable to provide a safe and stable home or long-term care based on his history of incarceration and domestic violence. The assessment stated respondent was not insightful or remorseful regarding how his life choices and behavior harmed himself, others, and his children. The report particularly expressed concern Ka. F. remain in foster care because she had mental health issues that could be worsened by a disruption in her care.

¶ 24        Respondent testified about times he visited Ka. F. when she was hospitalized. He also testified he had a good relationship with all of the children. He provided financial assistance

to the children by purchasing items for them. Respondent was employed full-time and currently lived with his girlfriend in stable housing. He believed he could adequately care for the children and provide for their needs. Respondent admitted his previous incarcerations upset the children.

¶ 25 The trial court found it was in the best interest of the children to remain in their current placements so their needs could continue to be met. The court particularly noted the recommendations of the GAL and information in the parenting assessment. The court further noted respondent had never been the custodial parent. The court stated the best chance the children had at stability was with their foster parents, and it found the foster parents were providing a sense of security. Thus, the court found the State proved by a preponderance of the evidence it was in the best interest of the children to terminate respondent's parental rights and change the goals of their cases to adoption or guardianship.

¶ 26 This appeal followed.

¶ 27 II. ANALYSIS

¶ 28 On appeal, respondent contends the trial court erred in determining (1) he was unfit and (2) it was in the children's best interest to terminate his parental rights.

¶ 29 A. Unfitness

¶ 30 Respondent first argues the trial court erred in finding the State proved he was unfit by clear and convincing evidence.

¶ 31 Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2022)), the involuntary termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as defined in the Adoption Act. *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006). If the State proves unfitness, it then must prove by a preponderance of the evidence that termination of parental

rights is in the best interest of the child. *In re D.T.*, 212 Ill. 2d 347, 363-66, 818 N.E.2d 1214, 1226-28 (2004).

¶ 32　　　　　A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29, 115 N.E.3d 102. A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *N.G.*, 2018 IL 121939, ¶ 29.

¶ 33　　　　　Section 1(D)(i) of the Adoption Act provides that there is a rebuttable presumption that a parent is depraved, and therefore unfit, if the parent "has been criminally convicted of at least 3 felonies under the laws of this State or any other state *** and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights." 750 ILCS 50/1(D)(i) (West 2022). "In Illinois, the term 'depravity' means an inherent deficiency of moral sense and rectitude. [Citation.] The State shows depravity by establishing that respondent has a deficiency in moral sense and either an inability or an unwillingness to conform to accepted morality." (Internal quotation marks omitted.) *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 18, 115 N.E.3d 1003.

¶ 34　　　　　Once the State makes a *prima facie* showing of depravity, the burden of rebutting the presumption of depravity rests on the parent. *In re J.A.*, 316 Ill. App. 3d 553, 562, 736 N.E.2d 678, 686 (2000). The parent must come forward with evidence "showing that, despite his convictions, he is not depraved." *J.A.*, 316 Ill. App. 3d at 562, 736 N.E.2d at 686. "Rehabilitation can only be shown by a parent who, upon leaving prison, maintains a lifestyle

suitable for parenting children safely." *In re J.V.*, 2018 IL App (1st) 171766, ¶ 183, 115 N.E.3d 1099. " 'The statutory ground of depravity requires the trier of fact to closely scrutinize the character and credibility of the parent[,] and the reviewing court will give such a determination deferential treatment.' " *J.V.*, 2018 IL App (1st) 171766, ¶ 184 (quoting *J.A.*, 316 Ill. App. 3d at 563, 736 N.E.2d at 678).

¶ 35        Here, the trial court's determination respondent was depraved was not against the manifest weight of the evidence. Respondent does not dispute he had more than three felony convictions, with at least one taking place within five years of the filing of the petition seeking termination of his parental rights. Further, as the court noted, respondent had been incarcerated for much of the younger children's lives, with his most recent felony convictions being in 2018.

¶ 36        Respondent argues he rebutted the presumption of depravity by showing his progress toward rehabilitation and completion of the tasks assigned to him. However, although the record shows respondent made notable progress toward reunification, he nevertheless violated his parole twice after the children were placed in foster care, causing emotional trauma to the children. In one of those instances, he misrepresented the conditions of his parole to his caseworker and had contact with Paige despite his history of domestic violence and a prohibition from contacting her. He also missed drug screens, initially did not allow a caseworker to inspect his home, and never progressed to unsupervised or overnight visits with the children. Multiple witnesses expressed concern about his ability to provide a safe and stable home for the children. Given respondent's admission of an extensive criminal history, coupled with his history of repeat parole violations, the trial court's determination respondent failed to rebut the presumption of depravity was not against the manifest weight of the evidence.

¶ 37        "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d 340, 349, 830 N.E.2d 508, 514 (2005). Because we find the trial court's determination of unfitness based on depravity was not against the manifest weight of the evidence, we need not address the remaining allegations of the petition.

¶ 38        Nevertheless, we note the trial court also found respondent failed to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect. See 750 ILCS 50/1(D)(m)(ii) (West 2022). Illinois courts have defined "reasonable progress" as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046, 871 N.E.2d 835, 844 (2007). This court has explained reasonable progress exists when a trial court "can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

¶ 39        Here, as with the trial court's determination of depravity, the court reasonably found respondent's multiple instances of incarceration prevented him from making reasonable progress toward reunification. During the time periods at issue, respondent never progressed to unsupervised visits and his ability to have the children in his custody in the near future was highly questionable. Thus, the court's determination regarding respondent's failure to make reasonable progress was not against the manifest weight of the evidence.

¶ 40                          B. Best Interest Determination

¶ 41        Respondent next contends the trial court erred in finding it was in the children's best interest to terminate his parental rights.

¶ 42    Once a parent has been found unfit under one or more grounds set out in the Adoption Act, the State must establish by a preponderance of the evidence it is in the minor's best interest to terminate parental rights. 705 ILCS 405/2-29(2) (West 2022); *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 97, 70 N.E.3d 282. " 'Proof by a preponderance of the evidence means that the fact at issue *** is rendered more likely than not.' " *In re D.D.*, 2022 IL App (4th) 220257, ¶ 50, 215 N.E.3d 302 (quoting *People v. Houar*, 365 Ill. App. 3d 682, 686, 850 N.E.2d 327, 331 (2006)). Once a parent is found unfit, the focus shifts to the child, and the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *D.T.*, 212 Ill. 2d at 364, 818 N.E.2d at 1227. Thus, following an unfitness finding, the trial court focuses on the needs of the child in determining whether parental rights should be terminated. *J.V.*, 2018 IL App (1st) 171766, ¶ 249. " 'A child's best interest is superior to all other factors, including the interests of the biological parents.' " *J.V.*, 2018 IL App (1st) 171766, ¶ 249 (quoting *In re Curtis W.*, 2015 IL App (1st) 143860, ¶ 52, 34 N.E.3d 1185).

¶ 43    The Juvenile Court Act lists several factors the trial court should consider when making a best interest determination. Those factors, considered in the context of the child's age and developmental needs, include the following:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of

- 14 -

relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 291 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)). Also relevant in a best interest determination is the nature and length of the minor's relationship with his or her present caretaker and the effect that a change in placement would have on the child's emotional and psychological well-being. *In re William H.*, 407 Ill. App. 3d 858, 871, 945 N.E.2d 81, 92 (2011). This court will not reverse a trial court's finding it was in a minor's best interest to terminate his or her parental rights unless it is against the manifest weight of the evidence. *In re Anaya J.G.*, 403 Ill. App. 3d 875, 883 (2010).

¶ 44       Here, the record shows the trial court's determination was not against the manifest weight of the evidence. The court noted the requirements of the Juvenile Court Act, and its findings were supported by the evidence. In particular, both Hull and the GAL submitted reports specially addressing the statutory factors. The court found the children needed stability, and the record shows their foster parents' homes met their physical, mental health, medical, and educational needs. In particular, all of the children had significant educational or mental health needs that were met by their foster families. While there was evidence the children had desired to be together and to see respondent, there was also evidence Ka. F. preferred to remain in her foster placement, and the other children were too young to fully express their wishes. There was also evidence that a change in the children's circumstances could be traumatic, especially in regard to Ka. F. Meanwhile, respondent did not show an ability to provide a permanent and stable home in the near future. Under these circumstances, where the children are well cared for in their placement and respondent's inability to provide permanency in the foreseeable future

was well established, the facts do not clearly demonstrate the court should have reached the opposite result in making its best interest determination.

¶ 45 Respondent argues he made significant progress toward unification and has a full-time income and safe home. But, as previously noted, he had also been incarcerated twice for parole violations, causing emotional trauma to the children, and had not progressed to unsupervised or overnight visits.

¶ 46 Essentially, respondent is simply asking this court to reweigh the evidence, something which we cannot do under a manifest weight of the evidence analysis. It is the province of the trier of fact to weigh the evidence, resolve conflicts in testimony, and assess the credibility of the witnesses. See *People v. Evans*, 209 Ill. 2d 194, 209-10, 808 N.E.2d 939, 947-48 (2004). "A reviewing court is not in a position to reweigh the evidence, but can merely determine if the decision is against the manifest weight of the evidence." *Tate v. Illinois Pollution Control Board*, 188 Ill. App. 3d 994, 1022, 544 N.E.2d 1176, 1195 (1989). Further, the trial court "receives broad discretion and great deference" in matters involving minors. *D.D.*, 2022 IL App (4th) 220257, ¶ 28. In sum, we agree with the State the evidence adequately addressed multiple statutory factors and the trial court's best interest determination was not against the manifest weight of the evidence.

¶ 47                                    III. CONCLUSION

¶ 48 For the reasons stated, we affirm the trial court's judgment.

¶ 49 Affirmed.