NOTICE
Decision filed 05/20/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 190444-U

NO. 5-19-0444

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* ADOPTION OF LOGAN L. and BRAYDEN N. | ) ) ) | Appeal from the Circuit Court of Madison County. |
| (Belinda Warren, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | No. 18-AD-126 |
| James Lyons III, | ) ) | Honorable Martin J. Mengarelli, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justices Cates and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's determinations that respondent was an unfit parent and that termination of respondent's parental rights was in the minor children's best interest were not contrary to the manifest weight of the evidence.

¶ 2    Respondent, James Lyons III, is the biological father of the minor children, Logan L., born on October 13, 2015, and Brayden N., born on March 26, 2013. Petitioner, Belinda Warren, is the paternal great aunt of the minor children. The circuit court found respondent to be an unfit parent based upon respondent's stipulation of unfitness and further determined that the termination of respondent's parental rights was in the minor children's

1

best interests. Respondent now appeals, arguing that the circuit court's findings were against the manifest weight of the evidence. For the following reasons, we affirm the circuit court's judgment.

¶ 3                                   I. BACKGROUND

¶ 4     Petitioner filed a petition for adoption of the minor children on October 17, 2018. The petition for adoption alleged that respondent was an unfit parent based on depravity pursuant to section 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2018)), because respondent had more than three felony convictions, including one felony conviction that occurred within the previous five years. Respondent's felony convictions listed within the petition for adoption were as follows:

> "a.    16-CF-2167, Madison County, Illinois, Domestic Battery/Bodily Harm, sentenced to 30 months' incarceration;
>
> b.      12-CF-1837, Madison County, Identity Theft/Knows ID Stolen, sentenced to probation 30 months[;]
>
> c.      08-CF-2847, Madison County, Obstruct Justice/Destroy evidence, sentenced to 2 years, 6 months incarceration;
>
> d.      09-CF-105, Jersey County, Aggravated Domestic Battery, 3 years incarceration;
>
> e.      06-CF-834, Madison County, Felon Probationer Escape Off Ret Theft/Display Merch/>$150, Sentenced to 24 months probation[;]
>
> f.    06-CF-144901 and 902, St. Clair County, Retail Theft, sentence to 24 months probation."

The petition for adoption further alleged that respondent was an unfit parent pursuant to section 1(D)(a) of the Adoption Act (750 ILCS 50/1(D)(a) (West 2018)), because respondent had abandoned the minor children.

2

¶ 5    Respondent was incarcerated within the Illinois Department of Corrections (IDOC), when the petition for adoption was filed. Respondent had been incarcerated within the IDOC since August 25, 2016. In response to the petition for adoption, respondent filed a *pro se* entry of appearance and a motion to dismiss on November 14, 2018. On November 16, 2018, the circuit court appointed counsel to represent respondent concerning the petition for adoption.

¶ 6    On March 29, 2019, the circuit court conducted a hearing on respondent's parental fitness. Respondent was present at the hearing with counsel. At the beginning of the hearing, the follow dialogue transpired:

> "THE COURT: *** It's my understanding that the Respondent is going to stipulate to the unfitness portion; is that correct?
>
> [RESPONDENT'S COUNSEL]: Yes, Your Honor.
>
> THE COURT: I still need to hear what evidence the Petitioner believes they would be able to prove and what you're stipulating to, okay?"

¶ 7    Petitioner then submitted three exhibits regarding respondent's criminal history. Exhibit 1 demonstrated respondent's aggravated domestic battery conviction on July 20, 2009, in matter 09-CF-105, Seventh Judicial Circuit, Jersey County, Illinois. Respondent had pled guilty to aggravated domestic battery in violation of section 12-3.3 of the Criminal Code of 1961 (720 ILCS 5/12-3.3 (West 2008)) and was sentenced to three years' incarceration and two years of mandatory supervised released. Exhibit 1 further indicated

that on June 26, 2009, respondent struck Holly M. Naylor[1] in the face with a TV tray which caused a large laceration between her eyes and fractured Naylor's nasal cavity.

¶ 8    Petitioner's exhibit 2 demonstrated respondent's felony convictions on charges of forgery and possession of a forging instrument on February 7, 2019, in matter 1811-CR03592-1, St. Charles City, Missouri. Petitioner's exhibit 3 was a copy of respondent's pretrial services criminal history in case 17-CF-2379, Third Judicial Circuit, Madison County, Illinois. The pretrial services criminal history indicated that, along with numerous misdemeanor convictions dating back to 1993, respondent had felony convictions in 2006, 2008, 2009, 2012, and 2016.[2]

¶ 9    There were no objections to the exhibits and the circuit court admitted the exhibits into evidence. Petitioner also orally stated for the record that respondent was convicted of at least three felonies, with one felony conviction within the previous five years, as required for a finding of depravity pursuant to section 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2018)). Petitioner also read respondent's felony convictions into the record. The circuit court confirmed that respondent was stipulating to the same.

> "THE COURT: And, [respondent's counsel], it's my understanding that you're stipulating to that; is that correct?

---

[1]Holly M. Naylor is the biological mother of the minor children. Naylor was determined unfit and her parental rights were terminated by the circuit court concurrent with respondent but are not at issue in this appeal.

[2]06-CF-834, Madison County, Illinois: felon probationer escape and retail theft; 08-CF-2847, Madison County, Illinois: obstruction of justice/destroying evidence; 09-CF-105, Jersey County, Illinois: aggravated domestic battery; 12-CF-1837, Madison County, Illinois: identity theft; and 16-CF-2167, Madison County, Illinois: domestic battery/bodily harm.

[RESPONDENT'S COUNSEL]: Yes, Your Honor."

¶ 10    The circuit court then held:

"THE COURT: Okay. Based upon the evidence presented to the Court, the Court finds that the Respondent James Lewis Lyons, III, has had at least three felony convictions with at least one felony conviction in the last five years, and based upon the stipulation will find him depraved in regards to the unfitness. So, he's found unfit by clear and convincing evidence by the stipulation."

¶ 11    The circuit court entered a written order the same day as follows:

"Cause called on fitness as to the defendant, James L. Lyons, III. The Defendant, after consultation with his attorney stipulates to the findings of unfitness pursuant to 750 ILCS 50/1(i) and to the criminal history as found in the pretrial services criminal history presented in 17-CF-2379."

The circuit court's written order was signed by the judge, respondent, respondent's counsel, petitioner, and petitioner's counsel.

¶ 12    On June 17, 2019, the circuit court entered a *nunc pro tunc* order stating that the circuit court's written order of March 29, 2019, failed to indicate that a hearing was conducted on March 29, 2019, in which evidence was presented, and that the circuit court found a factual basis for the acceptance of the respondent's stipulation of unfitness. As such, the circuit court's order of March 29, 2019, was amended to reflect that the circuit court found a factual basis for respondent's unfitness stipulation.

5

¶ 13 On August 12, 2019, the circuit court held a hearing concerning the best interest of the minor children. Respondent was present at the hearing and represented by counsel. At the beginning of the hearing, the circuit court stated:

"THE COURT: Okay, and for the record, on June 17, 2019, the mother was found unfit after a hearing, and on March 29, 2019, the father stipulated and the Court found the factual basis for a stipulation as to unfitness."

¶ 14 The circuit court further indicated that the parties were present and were proceeding with the best interests portion of the termination proceedings pursuant to the factors set forth in section 1-3(4.05) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-3(4.05) (West 2018)). At this point, respondent orally requested new counsel. Respondent informed the circuit court that he wanted:

"to consolidate the guardianship and the Order of Protection that [petitioner] has because it all involves the same thing, and to hire a private counsel or another lawyer, I guess, to do all of that. [Current counsel] only been appointed on the adoption."

¶ 15 Petitioner objected based on the timing of respondent's request, and the circuit court denied respondent's oral motion for new counsel. The circuit court heard the following evidence at the best interest hearing.

¶ 16 A. Testimony of Petitioner

¶ 17 Petitioner testified that she was 65 years old and in good health. She stated that she was retired from the U.S. Marine Corps and that there was nothing that prevented her from taking care of the minor children. Petitioner resided in South Roxana, Illinois, with the

6

minor children and her mother. At the time of the hearing, petitioner stated that Brayden was six years old and Logan was three years old. The minor children had resided with petitioner since November 17, 2015.

¶ 18 According to petitioner's testimony, in November 2015, petitioner was contacted by her daughter and informed that respondent needed a place for his children to reside. Petitioner contacted respondent directly and respondent had stated that "they were down and out with money and stuff like that." Petitioner told respondent that she would provide a home for the minor children for a period of one month. Respondent informed petitioner that he would only need a place for his minor children for two weeks. Respondent, however, did not come for the minor children in two weeks, or in a month. Petitioner testified that respondent never made any effort to have the minor children returned to him until petitioner filed for guardianship in 2017. At that time, petitioner stated respondent "fought it" but "they went back after almost a year" and petitioner obtained guardianship of the minor children in 2018.

¶ 19 Petitioner testified that respondent never took the minor children for medical care. Petitioner stated that the minor children were currently on public aid but would be covered under petitioner's military medical insurance if she were allowed to adopt the minor children. According to petitioner, respondent had also not provided any financial support. Petitioner stated that, on one occasion, respondent and the minor children's mother "brought over like two or three yogurts for Brayden."

¶ 20 Petitioner also testified that respondent did not visit the minor children. Petitioner stated that she had attempted to give respondent a Wednesday and a Sunday for visitation

for two to three hours, but petitioner could "probably count on one hand when [respondent] actually came and spent time." Petitioner testified that in the two years before petitioner was granted guardianship, respondent and/or the minor children's mother had visited the minor children less than 10, but probably no more than 7, times. Petitioner testified that she worked with respondent on visitation until around December of 2016 but then stopped because respondent and/or the minor children's mother were not showing up.

¶ 21    When specifically asked about the respondent, petitioner testified that respondent had probably been to visit the minor children approximately three times and the last visit would have been in March 2016, for Brayden's third birthday. Petitioner stated it was the only birthday of the minor children that respondent attended. Petitioner did admit that respondent sent a lot of correspondence to her and the minor children. The correspondence directed to petitioner, however, accused petitioner of molesting the minor children and "things of that nature." Petitioner stated that she had obtained an order of protection against respondent based on respondent's correspondence. The order of protection has been in place continuously since February 2017 and currently expires in 2021. Petitioner further stated that respondent was convicted of violating the order of protection and intimidating a witness in a proceeding in the circuit court of Madison County, Illinois, cause number 17-CF-2288.

¶ 22    Petitioner stated that the minor children were "happy adjusted kids." According to petitioner, the minor children have their own room and love their home. The minor children have stayed in the same home and have not been required to move, so the minor children are familiar with, and have friends in, the neighborhood. Petitioner testified that Brayden

8

is doing well in school and Logan is doing well in pre-K school. Further, petitioner's mother, daughter, granddaughters, and sister are in the area and often interact with the minor children. The minor children refer to petitioner as "mom" and petitioner's daughter as their sister. Petitioner acknowledged that Logan had asthma and that there were a few medical issues in the beginning, but further stated that Logan was under medical care and his asthma was under control.

¶ 23 Petitioner testified that there had never been any criminal activity in her home in the last five years, no episodes of domestic violence, and no police calls. According to petitioner, the minor children are in a stable home and they are loved.

¶ 24 Petitioner admitted that the minor children have a sister and two brothers and that the minor children have no contact with their siblings. Petitioner also admitted that she smokes approximately a half of a pack of cigarettes a day, but does so outside of the house. Petitioner acknowledged that smoking was potentially harmful to children, especially a child with asthma. Petitioner also acknowledged that there was an issue with the air quality in South Roxana due to a refinery, and an issue with toxic soil, but petitioner had no current plans of moving. Petitioner stated that if a move was necessary for the minor children's health, she would relocate.

¶ 25 Although respondent is petitioner's nephew, petitioner freely admitted that she no longer cared about respondent. Petitioner testified that "[respondent] is a piece of crap, okay. He is. It's not his first domestic and it won't be his last. He will hurt those kids." Petitioner contends that respondent had threatened to burn her house down, and that she believed that respondent would harm the minor children. Because of the threats, petitioner

does not speak about the respondent around the minor children. Petitioner also stated that she does not take the minor children to visit respondent in prison because petitioner believes a prison is not a place for children. According to petitioner, respondent had ample time to have a relationship with the minor children instead of obtaining felony convictions.

¶ 26 Finally, petitioner admitted that respondent contacted the Department of Children and Family Services (DCFS) alleging that petitioner abused the minor children, and that DCFS determined that the allegation was unfounded. Petitioner also acknowledged that her brother filed a DCFS complaint against her in 1995, accusing petitioner of sexually abusing him.

¶ 27                     B. Testimony of Jayme Warren

¶ 28 Jayme Warren[3] testified that is she is the petitioner's daughter and the respondent's cousin. Jayme stated that she speaks with her mother daily and still communicates with the respondent through telephone calls and letters. Jayme stated that she sees the minor children at least once a week and attempts to take the minor children overnight about once every other week. According to Jayme, the minor children are happy, excitable, and growing mentally and physically. Jayme stated that she talks to the minor children about their feelings and tells them about her cousin, but she does not clarify to the minor children that her cousin is the minor children's father.

¶ 29 Jayme testified that in her communication with respondent, she inquires how respondent is doing, what classes respondent is taking, and tells respondent about the minor

_____

[3]Since the witness's and petitioner's surnames are Warren, this court will refer to the witness by her first name to avoid any potential confusion.

10

children. Jayme testified that when she talks about the minor children to respondent, respondent states that he misses them, and Jayme believes respondent. Jayme also stated, however, that she believed respondent "misses the idea of them more." By that, Jayme explained that thinking about having fun with children can sound great, but having fun is not always what it turns out to be because parenting is more involved than hanging out at a beach because "[y]ou have to deal with the sand in the shorts, and yes, and there is more to it than the, Oh, let's go out for a day."

¶ 30 Jayme stated that she loved the respondent and believed that respondent loved the minor children. When asked whether she believed respondent would harm the minor children, Jayme stated that she could not be sure since respondent got frustrated easily. Jayme testified that she had never witnessed, or heard of, respondent harming the minor children, but that she had seen respondent hurt other people. Jayme did not believe that respondent could harm the minor children because petitioner was protective and would not allow respondent near the minor children. Jayme stated that her mother loved the minor children and that the minor children loved petitioner. According to Jayme, the minor children are well integrated in petitioner's home.

¶ 31 Jayme testified that respondent and the minor children had lived with respondent's mother and out of state for a while. Jayme stated that since respondent had been in Illinois, respondent and the minor children had lived in various motels and respondent had not provided the minor children with a stable home. From what Jayme had observed, respondent had not demonstrated the financial ability to take care of the minor children. Jayme testified that she believed that the best thing respondent did was to place the minor

children with petitioner because the minor children were living in a motel and money was tight when the minor children were residing with respondent.

¶ 32                  C. Testimony of Respondent

¶ 33    Respondent testified that he is the father of the minor children. Respondent stated that he was present at Brayden's birth. Thereafter, respondent and Brayden resided with respondent's mother for 2½ to 3 years. After residing with his mother, respondent moved with Brayden to California for about six months and then returned when respondent's mother's health got worse. Respondent and Brayden then resided in Granite City, staying "in motels and whatnot" because respondent's mother had moved in with petitioner and petitioner was caring for respondent's mother. Respondent's mother died a few months after respondent returned from California. Respondent stated that Brayden was happy, and that Brayden loved respondent and that respondent loved Brayden.

¶ 34    Respondent stated that a few months after returning from California, he began working for a guy in Granite City and that the work involved traveling out of state. Respondent was making minimum wage, but respondent contended that Brayden had good clothes, good shoes, and was well fed and well taken care of during this time. Respondent stated that he was attempting to get a house but stopped working as much and got incarcerated. Respondent testified that he was doing his best.

¶ 35    Respondent stated that in November 2015 he had contacted petitioner because of financial hardship. Respondent was working for a fencing company at that time and was going to Kansas City for work. Respondent stated that he knew the minor children's mother would not do well caring for the minor children on her own, so he contacted petitioner for

12

help. Respondent stated that the minor children were only at petitioner's house for four or five months that year and that he visited the minor children during that period. Respondent also stated that he had provided Brayden with clothes, toys, new shoes, and a few things, but was in and out of town due to work. Respondent was then incarcerated.

¶ 36 Respondent stated that he was not happy about petitioner having the minor children because respondent was aware of how petitioner tried to control everything. But respondent's mother had just died, and they were residing in a motel, so they needed assistance. Respondent testified that he was struggling to pay the rent by the day and he wanted a place where the minor children would not be moved around. Respondent testified that the minor children's mother was not really the best parent by herself and that respondent's family had helped raised Brayden before respondent's mother's death.

¶ 37 Respondent stated that, after he left the minor children with petitioner, he visited pretty regularly at first, but then petitioner began interfering with respondent's visitation. Respondent testified that he would attempt to call petitioner and could not reach her for weeks. Respondent asserted that the petitioner would "make up excuses" why respondent could not come to visit the minor children.

¶ 38 According to respondent's testimony, petitioner did not inform respondent that she had filed for guardianship by forging his signature. Respondent stated that he went to court and that petitioner's guardianship of the minor children was denied because respondent informed the court that he never signed the documents. Respondent visited the minor children once or twice after that but did not want to remove the minor children from petitioner's care. Respondent stated that he was incarcerated on August 25, 2016, and was

13

not able to visit the minor children due to his incarceration. Respondent testified that petitioner then got guardianship because respondent was incarcerated, and the minor children's mother did not contest it.

¶ 39    Respondent testified that the day after petitioner received guardianship, petitioner obtained an order of protection that included the minor children. Respondent stated that he was served with the order of protection on February 2, 2017, while incarcerated at a federal correctional center. Respondent testified that he could not contact the minor children because of the order of protection. Respondent stated that he had gotten abrasive in his letters because petitioner had not responded to the 9 or 10 letters respondent had sent to petitioner over several months, asking about the minor children.

¶ 40    Respondent testified that he had raised Brayden for two years and was with Brayden every day, so respondent was upset that petitioner would not give him any information pertaining to Brayden's welfare. Respondent testified that petitioner was forcing respondent to become adversarial when there was no need to be so. Respondent admitted that he began telling petitioner that "she was no good and an old bitch." Respondent, however, claimed that he never made any threats of violence towards petitioner or anyone else.

¶ 41    After the order of protection, respondent stated that he wrote to Jayme. Respondent testified that in one of his letters to Jayme, the state's attorney misconstrued a statement in the letter as a threat. Respondent stated that he only pled guilty to intimidating a witness because he could not afford an attorney, and that respondent did not believe his chances were good at trial. Respondent contended that he had filed several motions in an attempt

14

to have the circuit court rehear the guardianship case because it was clear that petitioner was not going to allow respondent contact with the minor children. Respondent stated that he has fought the order of protection "tooth and nail" because of the minor children, but that the circuit court has continued to deny his motions. Respondent testified that he would like to speak with the minor children but has not been allowed any contact since being incarcerated.

¶ 42    Respondent submitted various photographs of respondent with Brayden between the ages of one to three years old. Also submitted were two photographs of the minor children at petitioner's home, and respondent asserted that he visited the minor children 10 to 15 different times while the minor children were in petitioner's care. These photographs were admitted into evidence without objection. Respondent further asserted that he brought Brayden a blanket, some toys, "some Nikes," a box of fruit and yogurt and "things like that." Respondent further testified that he had offered his Link card to petitioner, but petitioner refused to accept it. According to respondent's testimony, the last time he saw Brayden was the day before respondent was incarcerated on August 24, 2016. Respondent stated that he was released in August 2017, however, the order of protection was still in place, and respondent could not contact the minor children. In January 2018, respondent was again incarcerated for a parole violation.

¶ 43    Respondent testified that he has taken four or five courses while incarcerated, including GEO drug rehabilitation, the behavior modification program, and lifestyle redirection and restoration maintenance. Respondent stated that he had also completed anger management and was currently enrolled in an automobile body repair course.

15

Respondent further noted that he was signed up for a class called "Inside-Out Dad," to be a better father for the minor children. Respondent testified that once he is released from prison, respondent's father has agreed to allow respondent the opportunity to perform automobile body repair and maintenance out of a shop his father has an interest in until respondent can move on to something else. Respondent stated that, ultimately, his employment goal was to work on barges.

¶ 44 Respondent also testified that he had earned "good time" for completing the courses and he expected to be released in approximately 50 days. Respondent stated that he would be required to complete four years of mandatory supervised release where respondent would be "on a short leash" and could be taken back into custody for any violation.

¶ 45 Respondent further stated that he spent considerable time with petitioner when he was a child and lived with petitioner "throughout his childhood" in Bethalto, Illinois. Respondent's mother also resided with petitioner at the time. According to respondent's testimony, petitioner was operating a foster home, and respondent witnessed petitioner have a relationship with a 15-year-old girl. Respondent further testified that petitioner had respondent sleep with her without any pants on, and would enter the bathroom while respondent was showering or using the toilet. Further, petitioner's brother came forward and accused petitioner of sexually molesting him as a child. Respondent stated that because of those incidents, he was concerned as to petitioner's true motives in keeping respondent away from the minor children. Respondent stated that he struggled with the decision to take the minor children to petitioner but knew that petitioner's mother and daughter were also present, so respondent believed the minor children would be alright.

16

¶ 46    Respondent stated that after being released, he had "places to go and try to find a house." Respondent also stated that there was $700 in a settlement from his grandfather and that respondent was "going to work up from that." Respondent argued that adoption would not be in the best interest of the minor children, where the minor children had a father who loved them, never abused them, and never had a DCFS investigation.

¶ 47    The circuit court requested a recommendation from the minor children's guardian *ad litem*. The guardian *ad litem*'s recommendation to the circuit court was that it was in the minor children's best interests that the parental rights of respondent be terminated so that petitioner could move forward with adopting the minor children. At the conclusion of the August 12, 2019, hearing, the circuit court took the matter under advisement.

¶ 48    On August 14, 2019, the circuit court issued a written order finding that respondent had stipulated on March 29, 2019, to be an unfit parent due to depravity. The circuit court indicated that it had found a factual basis for respondent's stipulation and had accepted the same. The circuit court also indicated that it had considered the testimony and exhibits tendered at the August 12, 2019, hearing. In evaluating the minor children's best interests, the circuit court stated that it used the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2018)), and the circuit court specifically addressed each factor in its written order. The circuit court then determined:

> "Based upon the above, the Court finds that the Petitioner has proved by a preponderance of the evidence that it is in the minors' best interests that any and all parental rights flowing to and through [respondent] *** with respect to the minors are hereafter permanently terminated.

17

The Court does not make this decision lightly. It was quite obvious to the Court that [respondent] loves his boys and that he did have a relationship with Brayden prior to the boys being in [petitioner's] care. It was also quite obvious that there is a lot of hostility between [petitioner] and [respondent]. If and when [petitioner] does in fact adopt both boys, the Court hopes that [petitioner] and [respondent] may be able to work through their differences so that [respondent] may be a part of the boys' lives once he gets out of prison."

¶ 49    Respondent appeals arguing that the circuit court's findings that respondent was an unfit parent and that termination of respondent's parental rights was in the minor children's best interests were against the manifest weight of the evidence

¶ 50                                    II. ANALYSIS

¶ 51    Before proceeding to an analysis of the issues raised on appeal, we note that pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), except for good cause shown, this court is to issue a decision within 150 days after the filing of the notice of appeal. The notice of appeal in this matter was filed on October 21, 2019. Accordingly, the decision in this case was due to be filed on or before March 19, 2020. However, the following events resulted in the placing of this appeal on the docket for March 25, 2020: (1) two motions for extension of time to file the record on appeal, dated November 20, 2019, and December 10, 2019; and (2) a motion for extension of time to file an appellant brief, dated January 10, 2020. For these reasons, we find good cause to issue this order past the deadline and proceed to the issues respondent raises on appeal.

18

¶ 52                    A. Unfit on the Grounds of Depravity

¶ 53    On appeal, respondent urges this court to reverse the circuit court's finding that he is an unfit parent as set forth in section 1(D)(i) of the Adoption Act. 750 ILCS 50/1(D)(i) (West 2018). Respondent contends that the circuit court had insufficient evidence of his felony convictions because the evidence presented at the fitness hearing was a copy of a pretrial services criminal history that, respondent argues, cannot reach the clear and convincing standard necessary for the circuit to find respondent an unfit parent. Respondent further argues that the circuit court was required to closely scrutinize respondent's character and credibility at the fitness hearing and failed to do so. Finally, respondent argues that the circuit court failed to inquire as to whether respondent understood what information was being used as the basis for a stipulation at the fitness hearing.

¶ 54    To terminate a parent's parental rights in a proceeding commenced under the Adoption Act (750 ILCS 50/1(D) (West 2018)), the circuit court must first find, by clear and convincing evidence, that the parent is unfit. *In re M.M.*, 156 Ill. 2d 53, 61 (1993). A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is arbitrary, unreasonable, and not based on the evidence. *In re G.W.*, 357 Ill. App. 3d 1058, 1059 (2005). The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill.

App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005).

¶ 55                    1. Evidence of Respondent's Felony Convictions

¶ 56    Section 1(D)(i) of the Adoption Act provides, *inter alia*, a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least three felonies under federal law, or the laws of any state, and at least one of the felony convictions occurred within five years prior to the filing of the petition or motion seeking termination of parental rights. Because the presumption is rebuttable, a parent may still present evidence showing that, despite the convictions, the parent is not depraved. The presumption, however, can only be overcome by clear and convincing evidence. 750 ILCS 50/1(D)(i) (West 2018).

¶ 57    In this matter, respondent did not present any evidence to overcome the presumption of unfitness. Instead, respondent stipulated to the evidence and to his parental unfitness. On appeal, respondent does not state that his felony convictions were misrepresented or incorrect but argues that a copy of a pretrial services criminal history was insufficient to reach the clear and convincing standard. Respondent, however, did not object to the evidence admitted at the time of the fitness hearing and did not raise the issue within respondent's motion to reconsider, or for a new trial.

¶ 58    To preserve an alleged error for appellate review, a party must object at trial and file a written posttrial motion addressing the alleged error. *In re William H.*, 407 Ill. App. 3d 858, 869-70 (2011). "Where a party fails to make an appropriate objection in the court

below, he or she has failed to preserve the question for review and the issue is waived." *In re April C.*, 326 Ill. App. 3d 225, 242 (2001). As such, respondent has waived the issue of whether a copy of pretrial services criminal history was sufficient to reach the clear and convincing standard.

¶ 59                    2. Acceptance of Respondent's Stipulation

¶ 60    Respondent next argues that the circuit court failed to inquire as to whether respondent understood that respondent's parental unfitness, and the evidence in support his unfitness, was being stipulated to at the hearing on March 29, 2019. Respondent, however, provides no statutory or precedential support for his argument that the circuit court was required to inquire whether respondent understood the proffered stipulation.

¶ 61    The circuit court, as a requirement of due process, was obligated to determine whether a factual basis existed for an admission of parental unfitness before it accepted respondent's stipulation. *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 32. However, the circuit court is not required to admonish respondent regarding the consequences of his admission, or to inquire regarding the voluntariness of his admission. *Id.* ¶ 34. In this matter, the circuit court went through each of respondent's felony convictions which formed the basis of respondent's stipulation and found that a factual basis existed for an admission of parental unfitness before it accepted respondent's stipulation. As such, we find respondent's argument that the circuit court was required to conduct an inquiry into respondent's understanding of his stipulation is without merit.

¶ 62                    3. Respondent's Character and Credibility

¶ 63   Respondent's argument that the circuit court was required to inquire into respondent's character and credibility at the fitness hearing is misplaced. Respondent cites to *In re J'America B.*, 346 Ill. App. 3d 1034, 1046 (2004), which states that, "[i]n determining depravity, the trier of fact is required to closely scrutinize the character and credibility of the parent." The underlying circuit court proceeding in *J'America* was a hearing on parental fitness in which depravity was contested and rebuttal evidence was presented. Here, respondent did not contest parental unfitness, and presented no evidence to rebut the presumption of his parental unfitness. As such, the circuit court was not required to scrutinize respondent's character and credibility at the fitness hearing since respondent's parental unfitness was undisputed.

¶ 64   Based on the above, we find that the circuit court had sufficient evidence to find a factual basis for respondent's stipulation of parental unfitness, and that the circuit court was not required to inquire on respondent's understanding of the stipulation. We further find that the circuit court was not required to scrutinize respondent's character and credibility at the fitness hearing. As such, the circuit court's determination that respondent was an unfit person pursuant to section 1(D)(i) of the Adoption Act was not against the manifest weight of the evidence. 750 ILCS 50/1(D)(i) (West 2018).

¶ 65                    B. Termination of Parental Rights

¶ 66   Once a finding of parental unfitness is made, the circuit court must then determine whether it is in the best interests of the child that the parental rights be terminated. *In re J.L.*, 236 Ill. 2d 329, 337-38 (2010). During this stage of the proceedings, the focus of the

22

circuit court's scrutiny shifts from the rights of the parents to the best interests of the child. *In re B.B.*, 386 Ill. App. 3d 686, 697 (2008). In determining the best interests of the child, the circuit court is required to consider certain enumerated factors in the context of the child's age and developmental needs. 705 ILCS 405/1-3(4.05) (West 2018). These factors include (a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including the familial, cultural, and religious ties; (d) the child's sense of attachments, which includes where the child actually feels love, attachment, and a sense of being valued, the child's sense of security and familiarity, the continuity of affection for the child, and the least disruptive placement alternative for the child; (e) the child's wishes and long-term goals; (f) the child's community ties, including church, school, and friends; (g) the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. *Id*. The circuit court's best interests determination does not need to contain an explicit reference to each of these factors. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 67    Respondent acknowledges that the circuit court's written order of August 14, 2019, addressed all of the statutory best interest factors that the circuit court was required to consider. However, respondent argues that those factors were skewed in petitioner's favor because petitioner had systematically attempted to remove respondent from the lives of the minor children. Respondent argues that the circuit court's determination that it was in the

minor children's best interests to terminate respondent's parental rights was against the manifest weight of the evidence because the circuit court failed to consider petitioner's alienation of respondent from the minor children. Respondent argues that if the adoption case had been consolidated with the guardianship and order of protection cases, the circuit court would have been able to address petitioner's conduct and not rely solely on the testimonies of the parties at the best interests hearing. It is respondent's position that the circuit court failed to mention that the only reason respondent did not have a relationship with the minor children was because of the actions of the petitioner.

¶ 68    In this matter, it is clear that the circuit court was aware of the hostility between the parties when making its determination that termination of respondent's parental rights was in the best interests of the minor children. The circuit court noted the hostility between respondent and petitioner in the circuit court's written order, as follows:

> "It was also quite obvious that there is a lot of hostility between Belinda and James. If and when Belinda does in fact adopt both boys, the Court hopes that Belinda and James may be able to work through their differences so that James may be a part of the boys' lives once he gets out of prison."

¶ 69    As stated above, the circuit court's best interests determination does not need to contain an explicit reference to each factor taken under consideration. Further, concerning respondent's argument on the consolidation of the cases, the circuit court's written order noted that, "[s]ince this Judge is already assigned the aforementioned cases, there was no need for the consolidation."

24

¶ 70 Respondent also argues that the circuit court ignored respondent's testimony that would have impacted the circuit court's findings. Respondent states that he testified that he had a job upon release and that he would be released within three months of the hearing. The circuit court's written order, however, contradicts respondent's argument that the circuit court ignored his testimony. The circuit court noted in its order that respondent indicated that he would like to get employment as a barge worker, but also indicated that while barge work was a good paying job, it usually required many weeks away from home at a time. Further, the circuit court noted that respondent would be released later that year, but also noted that respondent was required to serve four years of mandatory supervised release wherein respondent could be returned to jail for any violations. As such, there is no indication that the circuit court ignored respondent's testimony.

¶ 71 Respondent next argues that the circuit court ignored the fact that the minor children have three siblings, and that the minor children would have no relationship with those siblings if the adoption proceeded. Other than the fact that the minor children have siblings, there was no evidence presented at the best interests hearing concerning the location of the siblings, who had custody of the siblings, or whether the siblings had previous contact with the minor children. There was also no testimony at the best interests hearing that the minor children would have any contact with their siblings if respondent's parental rights were not terminated. The only testimony at the best interests hearing concerning the minor children's familial ties was that the minor children interacted with many biological family members at petitioner's home. Respondent's argument that the circuit court ignored the fact that the minor children have three siblings is without merit.

¶ 72 Finally, respondent argues that the circuit court did not take into consideration that respondent raised Brayden for the first 2½ years of Brayden's life and that there was no evidence presented demonstrating that the minor children were detached from respondent. In the circuit court's written order, the court noted in several of its findings that it had no doubt that both petitioner and respondent loved the minor children. The circuit court also specifically stated that:

> "The Court does not make this decision lightly. It was quite obvious to the Court that James loves his boys and that he did have a relationship with Brayden prior to the boys being in Belinda's care."

¶ 73 The circuit court acknowledged respondent's relationship with Brayden but also acknowledged that Logan had resided with petitioner for all but the first five weeks of his life. The circuit court further noted that Brayden had lived more than half of his life with petitioner. As such, it is clear that the circuit court did consider the fact that respondent raised Brayden for the first 2½ years of Brayden's life but also considered that petitioner had raised Brayden since that time and had raised Logan for all but the first five weeks of his life.

¶ 74 Based on the above, the circuit court's determination that termination of respondent's parental rights was in the best interests of the minor children was not against the manifest weight of the evidence.

¶ 75                                      III. CONCLUSION

¶ 76 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 77    Affirmed.