2026 IL App (1st) 250013-U

FOURTH DIVISION
Order filed: May 28, 2026

No. 1-25-0013

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* M.H., M.L., and M.H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 23JA475, |
| | ) | 23JA476, 23JA477 |
| v. | ) | |
| | ) | |
| M.H., | ) | Honorable |
| | ) | Lisa M. Taylor, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE QUISH delivered the judgment of the court.
Presiding Justice Navarro and Justice Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's orders adjudicating children neglected due to an injurious environment and placing them in the care of the Department of Children and Family Services were not against the manifest weight of the evidence when the children heard the physical abuse of their sibling, were residing in appropriate placements, and their mother had not completed all recommended services.

¶ 2    Respondent M.H. ("the Mother") appeals the circuit court's adjudication and disposition

orders adjudicating her children, Mi.H., M.L., and Ma.H. (collectively "the Children") abused or

neglected, making the Children wards of the court, and placing the Children in the care of the Department of Children and Family Services ("DCFS"). For the following reasons, we affirm the court's orders.[1]

¶ 3    I. BACKGROUND

¶ 4    On July 11, 2023, the State filed petitions seeking to have the Children adjudicated wards of the court under section 2-3 of the Juvenile Court Act ("JCA") (705 ILCS 405/2-3 (West 2022)). The State alleged that Mi.H. was found walking down the street wearing only shorts or underwear and stated that he left home because he was fearful of his Mother, who had sprayed him in the face with bug spray and hit him several times on various parts of his body with a belt and/or closed fists. The State further alleged that Mi.H. had a welt on his arm, his Mother smoked marijuana in front of him, and the Mother did not want Mi.H. to return to her home. The State reported that Mi.H.'s siblings were at home with his Mother and DCFS was unable to assess their safety. Based on these allegations, the State alleged that, under the JCA, all three children were neglected due to an injurious environment and abused due to a substantial risk of physical injury. The State also alleged that Mi.H. was abused due to the infliction of physical injury. At the time the petitions were filed, Ma.H. was 7 years old, M.L. was 14 years old, and Mi.H. was 13 years old. During subsequent proceedings, Ma.H.'s and M.L.'s fathers were defaulted. Mi.H.'s father appeared, but is not a party to this appeal.

---

[1] This matter qualifies for an accelerated disposition under Illinois Supreme Court Rule 311(a) (eff. Jul. 1, 2018). Based on the date the notice of appeal was filed, a decision in this case was originally due on June 2, 2025. However, due to a protracted briefing process that involved multiple extensions of briefing deadlines for all parties, the withdrawal and refiling of the Mother's brief due to a supplemental record, the filings of three separate supplements to the record, a change to the composition of the panel deciding this case, and a reassignment of the authorship of this order, we find good cause to extend the deadline. See Ill. S. Ct. R. 311(a)(5).

¶ 5    After a temporary custody hearing held that same day, the court removed Mi.H. from his Mother's care and placed him in the custody of the DCFS Guardianship Administrator. The court found probable cause to believe that Mi.H. had been abused and neglected and there was an immediate and urgent necessity for removal. The court also found probable cause to believe that Ma.H. and M.L. had been abused or neglected, but it did not find that there was an immediate and urgent necessity to remove them from the Mother's care. The court entered an order of protection for Ma.H. and M.L., which, among other things, required the Mother to ensure that Ma.H. and M.L. attended school daily. The court also appointed the Office of the Cook County Public Guardian ("Public Guardian") for the Children.

¶ 6    On October 4, 2023, the court found that the Mother had violated the order of protection because Ma.H. was not attending school and the Mother was not cooperating with DCFS. The court ordered the Mother to ensure that Ma.H. attended school every day and to cooperate with DCFS' requests for records and in-home visits.

¶ 7    On January 11, 2024, the Public Guardian filed a motion to violate and vacate the order of protection, asserting that the Mother had again failed to ensure that Ma.H. and M.L. attended school daily. Specifically, the Public Guardian alleged that Ma.H. had 13 unexcused absences, 6 excused absences, and 47 unexcused tardies and that M.L. had 21 unexcused absences, 3 excused absences, and at least 53 unexcused tardies. The Public Guardian further alleged that M.L. had attended only five full days during the entire school year, was failing two classes, and had a D- in another. The Public Guardian noted that M.L. was doing well in other classes and was capable of achieving higher grades. The Public Guardian also noted that Ma.H.'s frequent absences were particularly concerning because he is a "non-verbal autistic child, who has an extensive IEP

[individual educational program] to provide him with educational/learning support as well as Speech therapy, Occupational therapy, independent functioning training, and social work support," and he misses those critical services when he is absent from school.

¶ 8 At a hearing on the Public Guardian's motion on January 12, 2024, the court admitted without objection Ma.H's and M.L.'s school records. The Mother testified that in October 2023, she contacted Ma.H.'s school because she noticed that "his behavior had started changing in the morning" and she thought the guard was using a restraint that may be hurting him. The Mother told Ma.H.'s school that she would homeschool Ma.H. and find him another school. The Mother and Ma.H's school worked together to develop a plan to address the Mother's safety concerns, and Ma.H. then returned to school. The Mother testified that she is often late getting Ma.H. to school because it is difficult to get him ready in the morning. The Mother stated that she was aware that she could arrange for transportation for Ma.H., but she was waiting to arrange it because she was going to move to a new home in February and the registration process takes a long time. The Mother testified that she had a plan for getting Ma.H. to school on time after their move. According to the Mother, Ma.H. was doing well in school and had been student of the month and on the honor roll for the first, second, and third quarters. The Mother stated that she spent a lot of time reading and working with Ma.H. at home.

¶ 9 The Mother further testified that M.L.'s absences were due to sick days and "mental health days," but she could not explain what that meant. The Mother stated that M.L. had been an honor roll student prior to the July incident that precipitated this case and that M.L.'s poor grades were a result of her being overwhelmed with the DCFS case and not being able to help M.L. The Mother planned to get resources to help M.L., including workbooks, "apps," library books, and a laptop.

¶ 10    DCFS caseworker Ashonte Winston testified that she had been working on the case since July 2023. When she checked with their respective schools on October 20, 2023, both Ma.H. and M.L. had no absences at that time and their absences from school all occurred after that date. Winston last visited the family home on December 27, 2023, and had no safety concerns. The children also did not express any safety concerns regarding living with their mother. Winston explained that DCFS had not assessed Ma.H. and M.L. for services because they were not in DCFS custody. Winston testified that the Mother became more cooperative after October 4, 2023, and generally answered Winston's phone calls and questions.

¶ 11    The circuit court found that the Mother had violated the order of protection by failing to ensure that Ma.H. and M.L. attended school regularly. The court vacated the order of protection and entered a new temporary custody order placing Ma.H. and M.L. in the custody of the DCFS Guardianship Administrator. The court also ordered Ma.H. and M.L. be assessed for services and therapy. The State asked for leave to amend Ma.H.'s and M.L.'s adjudication petitions to include educational neglect, which the court granted.

¶ 12    On January 31, 2024, the Public Guardian filed a motion to find Ma.H. and M.L.'s placement not necessary and appropriate. Specifically, the Public Guardian alleged that Ms. C., a friend of the Mother and the foster parent with whom the Children had been placed, was not adequately administering medication, Ms. C.'s home was too small and did not have enough beds, Ms. C. had pushed Mi.H. onto a couch, and there was no adequate care plan for when Ms. C. went to work. On February 1, 2024, the court granted the Public Guardian's motion, and Ma.H. and M.L. were eventually placed with their maternal grandmother.

¶ 13    On September 23, 2024, the court held an adjudicatory hearing. At the outset, the court took judicial notice of the January 12, 2024, proceeding in which the court found the Mother violated the order of protection and placed Ma.H. and M.L. in the care of DCFS.

¶ 14    Uriah Baker testified that on July 7, 2023, he noticed Mi.H. in an alley crying and wearing only his underwear. Baker provided some clothes to Mi.H. Mi.H. told Baker that he did not want to go home because he was being harmed by his mother. Baker was able to flag down a passing police officer, who called an ambulance. Baker observed that Mi.H. had bruises and scarring.

¶ 15    Officer Armando Zambrano testified that on July 7, 2023, he was flagged down by an individual on the street, at which point he stopped and met with Mi.H. The individual informed him that he found Mi.H. wearing only shorts. Zambrano observed bruising and scarring on Mi.H.'s arms. When Zambrano asked him what had happened to his arms, Mi.H. stated that his mother punched him with a closed fist and hit him with a belt. Zambrano called an ambulance, which took Mi.H. to the hospital. When Zambrano later went to the Mother's home with a DCFS caseworker, the Mother refused to let them in and slammed the door.

¶ 16    DCFS caseworker Juanita Irvin testified that she met Mi.H. at the hospital on July 7, 2023, and observed that he had circular bruises on his upper back. Irvin did not notice bruises anywhere else. Mi.H. told Irvin that his mother had hit him with a belt on his arm and back, sprayed "chemicals" in his face, and threw him into the stairs. He reported that this had happened before. Mi.H. also told Irvin that he had sickle cell anemia and that he had not taken his medication in a few days, which left him in pain. He was afraid of returning home.

¶ 17    Irvin called the Mother, who said, "I don't want rights with my son" and that she did not want anything to do with him. The Mother hung up on Irvin. Irvin called back to try to obtain a

phone number for Mi.H.'s aunt, who was a family member with whom Mi.H felt safe. The Mother told Irvin not to call back unless she was bringing Mi.H. home and hung up again.

¶ 18 The next day, Irvin went to the Mother's house with two police officers. The Mother spoke with Irvin from an upstairs window and initially would not let her into the house. The Mother eventually allowed Irvin to enter without the police officers, but Irvin did not feel safe and refused to go in without them, so she did not enter. The Mother refused to bring Ma.H. and M.L. to the door.

¶ 19 Irvin and her supervisor made the decision to take protective custody of Mi.H. After she obtained a court order compelling the Mother to allow her to meet with them, Irvin was able to interview Ma.H. and M.L. Both children said they heard the Mother hitting Mi.H., but they did not see it. Irvin testified that Ma.H. has special needs and was not able to verbalize what was happening to him. Irvin did not see any bruises or marks on either Ma.H. or M.L.

¶ 20 Following Irvin's testimony, the court admitted Mi.H.'s hospital records into evidence without objection. The court found the witnesses to be credible and that the State met its burden by a preponderance of the evidence that Mi.H. was neglected due to an injurious environment and abused due to physical abuse and substantial risk of physical injury as a result of abuse by the Mother. As to Ma.H. and M.L., the court found that the State met its burden of proof by a preponderance of the evidence that they were neglected due to an injurious environment, but the State had not met its burden of showing that Ma.H. and M.L. were neglected due to substantial risk of physical injury because it interpreted the evidence as showing that the Mother "treated [Ma.H. and M.L.] differently" than Mi.H. The court entered adjudication orders on September 23, 2024, memorializing its oral rulings.

¶ 21 The court then held dispositional hearings and took judicial notice of the testimony and findings from the September adjudication hearing.

¶ 22 Guadalupe Rodriguez testified that she was Ma.H. and Mi.H.'s caseworker with Our Children Homestead. She testified that Ma.H. has been with his maternal grandmother since March 2024. Rodriguez had visited with him recently and did not observe any signs of abuse or neglect. Ma.H. was attending school regularly and receiving speech and occupational therapy services. When Rodriguez spoke with school staff, they did not report any concerns. Rodriguez had been attempting to find Applied Behavior Analysis ("ABA") therapy services for Ma.H., but was having difficulty finding any that were covered by his insurance. She had recently located such a service and expected to have Ma.H.'s referral paperwork completed by the end of the month. Ma.H. was also seeing a mentor.

¶ 23 Rodriguez further testified that Mi.H. was in a therapeutic foster home. She did not see any signs of abuse or neglect. Rodriguez reported that Mi.H. liked his new home and new school. According to Rodriguez, Ma.H. and Mi.H. were both having supervised visits with the Mother once a week, but the Mother canceled the most recent visit without providing a reason. Rodriguez testified that the Mother had not been consistent in attending her visits. She estimated that the mother had failed to attend three or four of the eight scheduled visits. Mi.H. was also having weekly phone calls with his father, who was incarcerated.

¶ 24 DCFS child welfare specialist Maia Laville testified that she was the caseworker for M.L. and the family. Laville reported that M.L. was living with her maternal grandmother. Laville had last visited the home in October 2024 and did not have any concerns. M.L. was having weekly sibling visits. M.L. was in the process of switching to a new school, and Laville had been informed

by M.L. and her grandmother that her school attendance "wasn't as up to par as it should be" due to "the grandmother's schedule, working, perhaps, also, her younger brother needed to be watched" and other "glitches." However, M.L. had been regularly attending school for the past two months. M.L. had been referred for individual therapy but had not begun. Laville hoped that M.L. would start that month.

¶ 25    Laville testified that the Mother had been referred for individual therapy and retained her own therapist, with whom she claimed to have been engaged for about a year. However, despite requesting that the Mother provide her with a consent form for the release of information regarding that therapy, Laville had not received one. The Mother had been recently referred for domestic violence classes but had not started. The Mother also told Laville that she had completed parenting classes with a different agency, but Laville had not yet been able to obtain proof of completion from the Mother or the agency, despite several attempts. The Mother was attending weekly visits with all three children together. Her attendance at the visits was "consistent at times," but the Mother had missed two visits recently. Laville stated that the Mother's conduct during the visits was appropriate.

¶ 26    DCFS supervisor Ketoya Sanders testified that DCFS recommended that the Children be made wards of the court and placed in the guardianship of DCFS with a permanency goal of returning home within 12 months.

¶ 27    The Public Guardian noted in its argument that M.L. "has communicated on occasion that she would like to return home to her mother" and also expressed her desire to stay with Ma.H. The Public Guardian recommended that both be kept in DCFS' care with the goal of returning them home.

¶ 28    In its oral ruling on December 11, 2024, the court found that "[r]easonable efforts have been made to prevent or eliminate the need for removal of [the Children] from the home" and that "[a]ppropriate services aimed at family preservation and family reunification have been unsuccessful." The court further found that the Mother was unable for some reason other than financial circumstances alone to care for, protect, train or discipline the Children and that it was in the Children's best interest to be removed from the Mother's custody and placed in the custody of the DCFS Guardianship Administrator with the right to find an appropriate placement.

¶ 29    The court set a permanency goal of returning the Children home within 12 months and deferred findings as to whether the Mother had made reasonable progress in her services. The court also found that DCFS made reasonable efforts to provide services for Ma.H. and Mi.H., but had not made reasonable efforts for M.L. The court noted that M.L. was not enrolled in school at that time and was not yet attending therapy.

¶ 30    The Mother appeals the circuit court's September 23, 2024, adjudication orders finding that Ma.H. and M.L. were abused or neglected due to an injurious environment and the court's December 11, 2024, disposition orders finding that she was unable to care for Ma.H. and M.L and that placement with DCFS was in their best interests. She does not appeal from any orders as to Mi.H. The trial court appointed an attorney to represent the Mother on appeal.

¶ 31    II. ANALYSIS

¶ 32    Before examining the merits of the Mother's appeal, we must address an issue that the Public Guardian raised regarding numerous substantive inaccuracies in the Mother's brief. The Public Guardian points out that, throughout her brief, the Mother misstates the facts or holdings of cases she cited in support of her arguments, incorrectly cites others, and references cases that do

not exist. The Public Guardian argues that the Mother's reliance on fictitious case holdings violates Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) and asks us to find the Mother's arguments forfeited. "'[B]ecause the merits of the case can be ascertained from the record and we have the benefit of *** cogent brief[s]' from the State and the Public Guardian, we will consider the merits" of the Mother's arguments. *In re Es. C.*, 2021 IL App (1st) 210197, ¶ 13 (quoting *Antonson v. Department of Human Services*, 2021 IL App (1st) 192272-U, ¶ 18). However, simultaneously with this decision, we issued a rule to show cause order to the Mother's counsel, requiring her to file a response addressing these issues. In the event we find sanctions are warranted, we will issue a separate written order imposing the sanction.

¶ 33    "In proceedings under the [JCA], the paramount consideration is the best interests of the child." *In re Z.L.*, 2021 IL 126931, ¶ 58 (citing *In re A.P.*, 2012 IL 113875, ¶ 18). "'[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances.'" *Id.* (quoting *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004)). The JCA sets forth a two-step process the trial court must follow in determining whether a minor should be removed from his or her parents' custody and made a ward of the court. *Id.* (citing *A.P.*, 2012 IL 113875, ¶ 18).

¶ 34    The first step is an adjudicatory hearing on the petition for adjudication of wardship where the court considers only whether the minor is abused, neglected or dependent. *Id.* at ¶ 59; 705 ILCS 405/2-18(1) (West 2018). If the court determines that a minor is abused or neglected, it then moves to the second step, which is the dispositional hearing. *Id.* ¶ 60 (citing 705 ILCS 405/2-21(2) (West 2018)). At that hearing, the trial court determines whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court. *Id.* (citing

705 ILCS 405/2-21(2)). The court "may consider the acts and/or omissions of the parents" in making that determination. *Id.* (citing *Arthur H.*, 212 Ill. 2d at 466).

¶ 35 The State has the burden of proving its allegations of abuse or neglect by a preponderance of the evidence. *Id.* ¶ 60. We will not disturb the court's finding of abuse or neglect unless it is against the manifest weight of the evidence. *Id.* ¶ 61 (citing *A.P.*, 2012 IL 113875, ¶ 17). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.* (citing *A.P.*, 2012 IL 113875, ¶ 17). Similarly, "[w]e will not reverse a court's findings of fact with regard to dispositional unfitness unless they are against the manifest weight of the evidence, and a trial court's dispositional order will not be reversed unless it is an abuse of discretion." *In re Zoey L.*, 2021 IL App (1st) 210063, ¶ 38 (citing *In re A.T.*, 2015 IL App (3d) 140372, ¶ 13). "'Because a trial court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the trial court's findings merely because the reviewing court may have reached a different decision.'" *In re A.S.*, 2020 IL App (1st) 200560, ¶ 22 (quoting *In re April C.*, 326 Ill. App. 3d 245, 257 (2001)). Indeed, in child custody cases, "'there is a strong and compelling presumption in favor of the result reached by the trial court.'" *Id.* (quoting *In re William H.*, 407 Ill. App. 3d 858, 866 (2011)).

¶ 36 A. Adjudication

¶ 37 Although the Mother asserts in her brief that she is contesting both the adjudication and disposition orders, she does not separate her arguments into distinct, structured legal challenges to each order. Instead, the Mother's argument seems to reflect three recurring contentions: (1) reunification is in Ma.H.'s and M.L.'s best interests; (2) DCFS did not make reasonable efforts to provide her with services and support; and (3) she has demonstrated an ongoing commitment to

her children and has substantially complied with her service plan. We will address these arguments where appropriate within our analysis of the two orders on review.

¶ 38    First, none of the Mother's arguments present any recognizable challenge to the court's adjudication orders finding Ma.H. and M.L. neglected due to an injurious environment. Instead, her only argument on that issue consists of conclusory assertions that "[t]he evidence presented on September 23, 2024 by caseworker Rodriguez *** strongly supports the defense of [the Mother] and demonstrates that the trial court's adjudication of neglect *** is not supported by the record," followed by a citation to four pages of the record; "there is no credible evidence of abuse or neglect by [the Mother]"; and unspecified "unsubstantiated allegations and isolated incidents do not justify the court's findings." The Mother does not cite any cases addressing that ground or explain which part of Rodriguez's testimony she believes supports her defense. Due to the lack of substantive argument and citation to supporting authorities, we would be justified in finding the Mother's challenge to the adjudication orders forfeited. See *In re Mi.R.*, 2022 IL App (5th) 210330-U, ¶ 22. However, due the important nature of the case, and with the assistance of the thorough and cogent briefs of the Public Guardian and the State, we will consider the merits of the issue. See *id.*

¶ 39    The trial court found Mi.H. to be abused due to physical abuse and due to substantial risk of physical injury as the result of abuse by the Mother, and neglected due to an injurious environment. In her reply brief, the Mother "acknowledge[d] that there was sufficient evidence for the adjudication of neglect and a dispositional finding" as to Mi.H and "makes no argument as to him for that reason." Thus, although she challenges the adjudication findings as to Ma.H. and M.L., she admits there was sufficient evidence that she abused and neglected their sibling.

¶ 40    The trial court found Ma.H. and M.L. neglected due to an injurious environment. The concept of neglect "'encompasses willful as well as unintentional disregard of parental duties.'" *In re K.C.*, 2024 IL App (1st) 240430, ¶ 88 (quoting *In re S.D.*, 220 Ill. App. 3d 498, 502 (1991)). Section 2-3(1)(b) of the JCA provides that, among other grounds, a minor may be adjudicated neglected when his or her "environment is injurious to the minor's welfare." 705 ILCS 405/2-3(1)(b). The "'term "injurious environment" cannot be defined with particularity,' but *** 'it includes the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children.'" *K.C.*, 2024 IL App (1st) 240430, ¶ 88 (quoting *Z.L.*, 2021 IL 126931, ¶ 89).

¶ 41    A minor may be adjudicated neglected due to an injurious environment when he or she has witnessed the abuse of a sibling. See *id*. ¶¶ 91-92 (stating that "we have repeatedly held that evidence that a child witnessed the abuse of a sibling may be sufficient to support a finding of neglect based on an injurious environment" and holding that the evidence supported such a finding of neglect); see also *In re Gray*, 131 Ill. App. 3d 401, 409 (1985) (holding that a finding of neglect was not against the manifest weight of the evidence when the children witnessed physical abuse of their stepsister). This principle is grounded in the idea that, when faced with evidence of prior abuse by a parent, "'the juvenile court should not be forced to refrain from taking action until each particular child suffers an injury.'" *Arthur H.*, 212 Ill. 2d at 477 (quoting *In re Brooks*, 63 Ill. App. 3d 328, 339 (1978)). Whether the abuse or neglect of one child constitutes neglect of a sibling depends on the unique facts of each case. *Id.* at 468-69.

¶ 42    Here, we agree with the trial court that the State proved Ma.H. and M.L. were subject to an injurious environment by a preponderance of the evidence. The Mother admits the State proved that she physically abused Mi.H. The evidence established that the Mother punched Mi.H. with a

closed fist and hit him with a belt, leaving visible marks that Irvin, Uriah Baker, and Officer Zambrano each observed, and that this had happened before. Further, DCFS caseworker Juanita Irvin testified that both Ma.H. and M.L. heard the Mother physically abusing Mi.H. This evidence was sufficient to support a finding of neglect based on an injurious environment. See *K.C.*, 2024 IL App (1st) 240430, ¶¶ 91-92. Additionally, the emotional damage that results from witnessing the physical abuse of a sibling is a valid consideration and further supports the court's conclusion. See *In re A.D.R.*, 186 Ill. App. 3d 386, 393-94 (1989). Accordingly, under the highly deferential standard of review that we apply on this issue, we conclude that the Mother has not shown that the court's finding was against the manifest weight of the evidence. See *Z.L.*, 2021 IL 126931, ¶ 61.

¶ 43    B. Disposition

¶ 44    We next examine the propriety of the court's disposition order. "Prior to committing a minor to the custody of a third party, such as DCFS, a trial court must first determine whether the parent is unfit, unable, or unwilling to care for the child, and whether the best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." (Emphasis removed.) *In re M.M.*, 2016 IL 119932, ¶ 21 (citing 705 ILCS 405/2-27(1) (West 2012)). The Mother contests the court's findings on both prongs, arguing that reunification, rather than placement with DCFS, was in Ma.H.'s and M.L.'s best interests and that any inability to show that she is able to care for them was due to DCFS' failure to make "reasonable efforts" and "reasonable progress" towards reunification.

¶ 45    We first observe that the Mother's arguments regarding DCFS' alleged duty to make "reasonable efforts" or "reasonable progress" towards reunification reflect a misunderstanding of the law. Notably, she does not cite any statutory provision imposing such requirements on DCFS

at the disposition stage, and indeed, there does not appear to be one. Rather, while those terms do appear in various related contexts, none are applicable here.

¶ 46    Specifically, section 1(D)(m) of the Adoption Act ("Adoption Act") (750 ILCS 50/1 *et seq.* (West 2024)) provides that, in termination of parental rights proceedings, a parent may be deemed an "unfit person" whose parental rights may be terminated if he or she fails "to make reasonable efforts to correct the conditions that were the basis for the removal of the child" or "to make reasonable progress toward the return of the child to the parent" during any 9-month period following the adjudication of abuse or neglect. 750 ILCS 50/1(D)(m) (West 2024)); see also *In re Jacorey*, 2012 IL App (1st) 113427, ¶ 21. Elsewhere, the JCA allows for the expedited termination of parental rights "when reasonable efforts are inappropriate, or have been provided and were unsuccessful, and there are aggravating circumstances." 705 ILCS 405/1-2(1)(a) (West 2024). Additionally, section 2-10(2) of the JCA provides that, at a temporary custody hearing, "[i]n determining the health, safety, and best interests of the minor to prescribe shelter care, the court must *** find that reasonable efforts have been made or that, consistent with the health, safety and best interests of the minor, no efforts reasonably can be made to prevent or eliminate the necessity of removal of the minor from the minor's home." 705 ILCS 405/2-10(2) (West 2024). However, the Mother's challenge to the court's disposition order in this case does not involve any of those situations and thus, we reject her argument.

¶ 47    More to the point, this court has addressed this issue at the disposition stage and stated that "issues regarding whether a minor should be adjudged a ward of the court are not related to issues regarding reasonable efforts on the part of DCFS toward reunification." *In re William H.*, 407 Ill. App. 3d 858, 869 (2011). Rather, "[t]hese concepts are on two wholly different planes," and it is

the best interest analysis "that is key to a wardship decision, not a finding regarding whether reasonable efforts toward reunification were employed by an agency involved in the cause." *Id.* Indeed, section 2-27(1.5) of the JCA, which governs the placement of a minor in the care of DCFS, requires the court to consider whether "appropriate services aimed at family preservation and family reunification have been unsuccessful in rectifying the conditions that have led to a finding of unfitness or inability to care for, protect, train, or discipline the minor," or whether "no family preservation or family reunification services would be appropriate," but it does not impose any requirement to consider the efforts of DCFS to assist the parent. 705 ILCS 405/2-27(1.5) (West 2024).

¶ 48　　The Mother cites several cases in support of her argument, but none are applicable here, as they all either relate to termination of parental rights proceedings and section 1(D)(m) of the Adoption Act *(In re Jaron Z.*, 348 Ill. App. 3d 239 (2004), *In re R.L.*, 352 Ill. App. 3d 985 (2004), *In re C.N.*, 196 Ill. 2d 181 (2001), and *In re A.J.*, 269 Ill. App. 3d 824 (1995)), or include no relevant discussion of DCFS' alleged duty to assist a parent with the completion of services (*In re D.T.*, 212 Ill. 2d 347 (2004), *In re K.S.*, 317 Ill. App. 3d 830 (2000)). Accordingly, we find the Mother's challenge to the disposition orders on these grounds to be without merit.

¶ 49　　The evidence supported the court's finding that the Mother was unable to parent Ma.H. and M.L. This court has on many occasions affirmed a finding of parental inability when the parent had not completed recommended services and not addressed the reasons for the removal of his or her child. See, *e.g.*, *In re Malik B.-N.*, 2012 IL App (1st) 121706, ¶¶ 59-60; *In re M.W.*, 386 Ill. App. 3d 186, 199-200 (2008); *In re Kamesha J.*, 364 Ill. App. 3d 785, 796 (2006). Notably, we have made that same determination even when the parent was not entirely at fault for his or her

failure to complete all services. See, *e.g.*, *In re Chelsea H.*, 2016 IL App (1st) 150560, ¶¶ 87-90; *In re Marianna F.-M.*, 2015 IL App (1st) 142897, ¶ 36.

¶ 50    Rather, the evidence in this case showed that the Mother had been referred to individual therapy, parenting classes, and domestic violence classes. The Mother first reported that she was not interested in therapy, but then claimed that she had been seeing a privately-retained therapist. However, she did not provide DCFS caseworker Laville consent to obtain information related to that therapy. The Mother also told Laville that she had completed parenting classes with another agency, but she did not have a certificate of completion and Laville had been unsuccessful in obtaining one from the agency. Finally, although she was referred for domestic violence counseling, the Mother denied needing such services and had not attended any such classes. As of March 2024, the Mother was noted to be inconsistent with parenting classes and therapy. In July 2024, the Mother told her DCFS caseworker that she stopped therapy and was not interested in resuming any referral services. The Mother was also inconsistent with her visits with Ma.H. and M.L. Because the Mother had either not begun or not shown proof of completion of any of the recommended services, we cannot say that the court's finding that the Mother was unable to parent Ma.H. and M.L. was against the manifest weight of the evidence or an abuse of its discretion. See *Chelsea H.*, 2016 IL App (1st) 150560, ¶¶ 87-90 (holding that a circuit court's finding that a mother was unable to parent her children was not against the manifest weight of the evidence when she had not completed all recommended services, even when one of the services had not been available, noting that the focus must remain on the best interests of the children).

¶ 51    The final issue is "whether it is consistent with the health, safety and best interests" of Ma.H., M.L., and the public that Ma.H. and M.L. be made wards of the court. *A.P.*, 2012 IL

113875, ¶ 21 (citing 705 ILCS 405/2-21). The Mother argues that wardship and placement with DCFS was not in Ma.H.'s and M.L.'s best interests. Primarily, she contends that Ma.H. and M.L. are experiencing emotional harm from the separation and instability that comes with being placed in foster care and that DCFS has failed to adequately support them.

¶ 52    In arguing that their foster placements have been inadequate, the Mother notes that Ma.H. was not consistently receiving his medication and had not yet begun ABA therapy, which she contends is vital to his development. She also notes that M.L. has been sharing a sleeping space with her siblings, had missed school during a school transition, and often had to stay at home to watch her younger brother. However, the Mother's account of the facts is inaccurate in two respects. Contrary to the Mother's assertions, the issues related to the improper administration of medication and inadequate sleeping space occurred with Ma.H.'s and M.L.'s earlier foster parent, Ms. C. The evidence at the disposition hearing showed that their move to their maternal grandmother's home, their current placement, had remedied those issues.

¶ 53    Caseworker Rodriguez testified that she did not have any concerns with Ma.H.'s placement with his grandmother. Further, Ma.H. was regularly attending school where he received speech and occupational therapy services, and school staff did not have any concerns. Ma.H. was also seeing a mentor. While it is true that Rodriguez had encountered difficulty finding ABA therapy services for Ma.H., she had recently located one and expected to have Ma.H.'s referral paperwork completed soon. As for M.L., caseworker Laville similarly testified that she had no concerns with M.L.'s placement. Although M.L. had missed some school due to a school transition and difficulties with scheduling or paperwork, M.L. had been attending school regularly for the preceding two months. Further, M.L. was due to start therapy within a month.

¶ 54  Thus, the record does not reflect any significant concerns with Ma.H.'s or M.L.'s current placements. Further, the court made note of issues that DCFS needed to continue working on, such as M.L.'s therapy, instructed DCFS to ensure that all recommended services had been referred, and scheduled a status hearing to review DCFS' progress.

¶ 55  The record supports the trial court's decision to make Ma.H. and M.L. wards of the court and its findings that placement with DCFS was in their best interests and that the Mother was unable to parent them. As recounted above, both children were in an appropriate placement with a family member and their caseworkers did not have any concerns. Both children were attending school regularly and either receiving or due to begin receiving recommended services. Further, although the Mother contends that she made progress in her services and demonstrated a continued commitment to regaining custody of Ma.H. and M.L., the fact remains that she had not provided proof of completion of any of her recommended services, and her participation in visitation was inconsistent and remained supervised. Additionally, both DCFS and the Public Guardian recommended that Ma.H. and M.L. be made wards of the court and remain in the care of DCFS.

¶ 56  Because Ma.H.'s and M.L.'s needs were being met and the Mother had not completed recommended services or demonstrated that she had remedied the issues that led to the removal of the Children, we conclude that the court's finding that placement with DCFS was in Ma.H.'s and M.L.'s best interests was not against the manifest weight of the evidence or an abuse of its discretion. See *In re H.B.-H.*, 2025 IL App (1st) 242275, ¶ 83 (holding that the evidence supported the circuit court's dispositional order placing the child in the care of DCFS when, even though the Public Guardian had raised complaints about DCFS' placement of the child, the child's mother had not completed recommended services); *In re V.S.*, 2023 IL App (1st) 220817, ¶ 65 (holding

that the circuit court's dispositional order placing the child in the care of DCFS was not against the manifest weight of the evidence when, although the parent and child had a strong bond and the child's caseworker supported eventual reunification, the parent had not yet completed all recommended services).

¶ 57 Lastly, we note that the Mother raises new arguments for the first time in her reply brief regarding the court's alleged failure to make individualized findings as to each child before ordering removal and that the court must consider less restrictive alternatives before removal. Those arguments are forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (prohibiting a party from raising new arguments in a reply brief); *Asher Farm Limited Partnership v. Wolsfeld*, 2022 IL App (2d) 220072, ¶ 38 (finding a new argument raised in a reply brief to have been forfeited).

¶ 58 For the foregoing reasons we affirm the circuit court's adjudication and disposition orders.

¶ 59 Affirmed.